State of California *v.* McCauley.

---

# THE STATE OF CALIFORNIA *v.* McCAULEY & TEVIS.

The Act of March 21st, 1856, creating a Board of State Prison Commissioners, and defining their duties, is constitutional. It does not create a debt or liability against the people of the State, in contravention of the eighth article of the Constitution, and the contract made with Estill under the act is valid and binding upon the State.

Under the contract made with Estill for the payment to him of $10,000 per month on his lease of the prison and convicts, that sum per month is appropriated by the act; but these appropriations are to take effect, and the services are to be rendered, in future. Until the services are rendered, there is no debt on the part of the State. The State became indebted only as the services were each month performed. The lessee could not have claimed, at any time after the contract was made, the aggregate of all the monthly installments, because the State never owed him that amount.

The support of convicts is as much the duty of the State, as to provide for the salaries of her officers. It constitutes one of the ordinary sources of the State's expenditures; and a law authorizing a contract for keeping the prisoners at a fixed price—the payment and the services being future acts—is not in conflict with the Constitution.

The eighth article of the Constitution was intended to prevent the State from running into debt, and to keep her expenditures, except in certain cases, within her revenues. These revenues may be appropriated in anticipation of their receipt as effectually as when actually in the Treasury. The appropriation of the moneys, when received, meets the services as they are rendered, thus discharging the liabilities as they arise, or rather anticipating and preventing

State of California *v*. McCauley.

their existence. The appropriation accompanying the services operates in the nature of a cash payment.

The fact that the Act of 1856 authorizes the transfer of the convicts to private individuals, and the lease of the labor of future convicts, does not render the act unconstitutional. The power over the whole subject of punishment for crime is vested in the Legislature—the only limitation being the inhibition against the infliction of cruel and unusual punishments, which mean those of a barbarous character, unknown to the common law.

The rights of the lessee, however, must be subordinate to the right of the Governor to pardon, and thereby discharge the convicts from custody; and to such modifications in the extent of punishment as may be made by future legislation.

The objection to the contract with Estill, under the Act of the twenty-first of March, 1856, that it contained stipulations for the release of claims held by Estill against the State, thereby increasing the amount of the monthly payments, cannot be raised at this late day—three years having elapsed since the execution of the contract, and it having been in part performed on both sides, and thus acquiesced in and affirmed.

The fact that the contract with Estill was signed by the Commissioners with their individual names, and not with the name of the State, does not make it defectively executed. The contract purports in its body to be between the State, acting by the Commissioners under the Act of March 21st, 1856, of the one part, and Estill on the other, and is signed by the Commissioners with the affix of "Board of State Prison Commissioners." This makes it the contract of the State and not of the Commissioners.

Upon this point, the rule applicable to contracts of a private character differs from the rule governing contracts made by agents of the Government. Such public agents are presumed to contract, not personally, but officially, within the sphere of their duties.

Cases on this rule cited.

The Act of March, 1856, having authorized the Commissioners to execute a lease, without prescribing any specific form, or containing any restrictions as to assigning, and the lease being in its terms assignable, and no objections to this form of contract having been made at the time, it is too late to interpose them after the contract has been acted upon both sides, and thus adopted and approved. The personal liability of the assignor continued after his assignment to McCauley. The security of his bond was not impaired thereby.

If some of the covenants of the lease do not bind the assignee, the State cannot have relief on that ground. She can claim no greater exemption than an individual from the consequences of an unwise contract.

The State cannot rescind the contract made with Estill for breaches of the covenants of the lease by him and his assignee, so long as she herself is in default.

One party cannot violate a contract himself, and then seek to rescind it on the ground that the other party has followed his example.

Nor, when the contract has been in part performed, and the parties cannot be restored to their original position, can the right of rescission exist.

In this case, the State, being in default in making the monthly payments under the contract as they became due, and for months previous to this suit refusing to

pay at all; not offering to make restitution of the property received of the lessee, or pay the value of the claims relinquished by him at the execution of the contract, or to pay what the complaint shows to be now due; and it not being possible to restore Estill & McCauley to their original position, they having been in possession of the prison for nearly three years, and having performed valuable services, cannot claim in equity a rescission of the contract.

It is too late for the State to complain that the contract did not exact of the lessee security against breaches thereof, other than the bond of $200,000 required by the Act of March 21st, 1856, or did not reserve to the State the right to re-enter and resume possession of the premises, and control of the prisoners, whenever she deemed proper.

APPEAL from the Seventh District.

The pleadings consisted of the complaint, demurrer and answer.   On the argument in this Court, most of the grounds of demurrer were waived, except that the complaint does not state facts sufficient to constitute a cause of action.   The Court ·below gave final judgment for defendants on the demurrer, having previously denied the preliminary injunction asked.   Plaintiff appeals from the judgment, and from the order refusing the injunction.

The law under which the contract with Estill was made is as follows:

*AN ACT creating a Board of State Prison Commissioners and Defining their Duties.*

[Approved March 21st, 1856.]

*The People of the State of California,*
        *represented in Senate and Assembly, do enact as follows:*

SECTION 1.   The Lieutenant Governor, Controller and Treasurer are hereby constituted a Board of Commissioners, whose duty it shall be to lease the State prison grounds and property, together with the convict labor of this State, for a period of five years, at a price not to exceed $15,000 per month, and in conformity with the provisions of this act.

SEC. 2.   In any contract entered into by said Board, provision shall be made for the erection of such buildings, and for making such improvements on the property owned or leased by the State, at the expense of the lessee, for such purposes as will conduce·to the safety and convenience of keeping, working, clothing, feeding and providing medicine and medical attendance for the convicts of the State, and without subjecting the State, in any way, to any payment of any amount whatever

for the same.   Such work to be done in accordance with a plan to be approved by the Board of Commissioners, and at such time and place, and of such material as they may order ; *provided,* that no sum of money whatever shall at any time be allowed or audited by the said Board of Commissioners, for any extras in the way of work or materials used in building, or the support and maintenance or medical attendance upon the prisoners or convicts ; *and provided, further,* that no relief for the recapture of escaped convicts, or for damages of any nature whatever incident upon the taking care of and working said convicts, shall be at any time allowed to the said lessee, but he shall be individually responsible for all losses and damages, and shall receive no compensation or remuneration whatever, except that which shall be stipulated in the contract entered into between the said lessee and Board of Commissioners.

SEC. 3.   The Board of Commissioners shall make such rules and regulations governing said prison, alter and amend the same at pleasure, and cause them to be observed by the infliction of such penalties as they may deem proper.

SEC. 4.   The State Prison Directors are hereby required to give their daily attention to the enforcement of such rules and regulations as are provided for in the preceding section, to see that all buildings and improvements are made in accordance with the contract, and upon any deliquency on the part of the lessee, to report the same to the Board of Commissioners, whose duty it shall be to investigate the same, and if the charge be true.and the party culpable, they shall, by ordering suit to be commenced on his official bond or otherwise, correct the abuse.

SEC. 5.   The Board of Commissioners shall, from time to time, visit the prison and examine into its government, and from personal observation and conference with the Directors, change, alter or abolish such rules and regulations as may in their judgment be found necessary. The sum of five hundred dollars per annum is hereby appropriated out of any money in the Treasury not otherwise appropriated, to defray the expenses of said Board of Commissioners, and the Controller is hereby authorized and required to draw warrants on the Treasurer, and the Treasurer of State is hereby directed to pay the same on application of the President of said Board.

SEC. 6.   The Board of Commissioners shall require the lessee to execute bonds in the penal sum of not less than $200,000, with two or more good and sufficient securities to be approved by said Board, for the faithful performance of his contract.

SEC. 7. The sum of $15,000 per month, or such sum per month less than that amount, in accordance with the contract to be made by said Board of Commissioners, as specified in sections first and second of this act, is hereby appropriated out of any money in the Treasury not otherwise appropriated, and the Controller of State is hereby authorized and required to draw his warrants on the Treasurer of State for said sum; and the Treasurer of State is hereby directed to pay the said warrants on application of said lessee, in writing, on the last day of each month.

SEC. 8. An act entitled "An Act for securing the State Prison Convicts," passed April 25th, 1851, and so much of an act entitled "An Act for the Government of the State Prison," passed May 7th, 1855, as relates to the future election of State Prison Directors, and so much of the other sections of said act as conflicts with the provisions of this act, are hereby repealed.

The contract is as follows:

" This indenture, made and entered into this twenty-sixth day of March, A. D. one thousand eight hundred and fifty-six, between the State of California, by Robert M. Anderson, Lieutenant Governor, G. W. Whitman, Controller of the State of California, and Henry Bates, Treasurer of the State of California, constituting the Board of State Prison Commissioners, created by an act of the Legislature of said State of California, entitled 'An Act creating a Board of State Prison Commissioners, and defining their duties,' approved the twenty-first day of March, A. D. 1856, party of the first part, and James M. Estill, party of the second part, witnesseth:

" That the said party of the first part, for and in consideration of the covenants and agreements hereinafter mentioned, reserved, and contained, on the part and on behalf of the said party of the second part, to be done, kept, and performed, hath granted, bargained, demised, and to farm-letten, to the said party of the second part, his heirs and assigns, all that certain tract or parcel of land situate on Point San Quentin, in the county of Marin, and State aforesaid, and known as the State prison property, consisting of thirty-six acres of land, more or less, together with all and singular the prison and houses, and all improvements and houses thereon situate; also, all the shipping, vessels, boats, fixtures, implements, tools, furniture, stock, and other property belonging to the State of California, now on, attached to, or connected with, said State Prison, together with the labor of all the convicts now in said State

Prison, or who may hereafter be confined therein, during the continuance of this lease; together with any and all real estate or other property that may hereafter be purchased or acquired by the State of California for State Prison purposes, or in any manner connected with the same; to have and to hold the premises and property above described and mentioned, and the labor of said State prison convicts, unto the said party of the second part, and to his heirs and assigns, from the date of these presents, for and during, and until the end, of the full term of five years thence next ensuing and to be fully completed and ended.

"And it is further agreed and stipulated, by the said party of the first part, to and with the party of the second part, that on the last day of each and every calendar month during the continuance of the said term of five years, mentioned as aforesaid, the State of California will pay to the said party of the second part the just and full sum of $10,000, to be paid in conformity with the law creating said Board of Commissioners, and defining their powers and duties, and with the limitations hereinafter stipulated.

"And the said James M. Estill, party of the second part, covenants and agrees to and with the State of California, party of the first part, that for and in consideration of the use and occupation of the premises, property, and the labor of the State prison convicts above mentioned, and the said several sums of money to be paid to the said party of the second part by the said party of the first part, as above mentioned, he, the said party of the second part, will receive and take charge of all convicts now confined in said State prison, or any other State prison which may be established by authority of law, or who may hereafter be convicted and sentenced, or commuted to imprisonment in the State prison or State prisons now established, or which may be, in the State of California, during the said term of five years above mentioned; and that he, the said party of the second part, will safely keep the said convicts, as required by law, in said prison or prisons, for and during said term of five years, at his own proper cost and expense; will provide, under the direction of the State Prison Commissioners, the necessary and proper overseers, guards and employees for said prison or prisons; and to furnish to said State prison convicts suitable, proper and wholesome food, drink, clothing and medical attendance; and to treat such convicts humanely, and with all due degree of kindness consistent with their security and safety.

"And the said party of the second part further covenants and agrees

that he will, at his own proper cost and expense, establish and erect such buildings, prisons and walls, and make such other improvements on the premises above mentioned and described, or which may be purchased or acquired for such State prison uses and purposes by authority of the State, as will conduce to the safety and convenience of properly keeping, securing, working, clothing, feeding and providing medicines and medical attendance for the State convicts, and treating and using them humanely, and without subjecting the State, in any way or manner, to any payment, charge, expense, or demand for the same, except the salaries of the State Prison Directors now in office; but the said party of the second part agrees to furnish the Directors, when necessarily residing at the prison, with fuel and provisions out of the stock supplied for the general use of the prison. The work and buildings, as before described and referred to, are to be done in accordance with a plan, or plans, and specifications, which shall be approved by the Board of Commissioners, and at such times, at such place or places, and of such materials as they may order; and the said party of the second part covenants and agrees, to and with the said party of the first part, acting on behalf of the State, that he will use due diligence for the capture and recovery of all or any convicts that may escape from said State prison or prisons, and that he will pay such reasonable rewards for their apprehension and return during the continuance of this lease; said rewards to be assessed by the Board of State Prison Commissioners.

"And the said party of the second part agrees to release, and does hereby release to the State of California, all claims, whether legal or equitable, which he has against the State of California, arising out of his former connection with the State aforesaid, as the lessee of the State prison and convict labor, or for property and materials sold to or used by State officers or employees of said prison, for the use of the State.

"Also, a claim for $48,800, more or less, for property purchased by the State Prison Directors, or other State officers, from Archibald Woods, Esq., and to hold the State of California harmless from such claim, or any part thereof. Also, a claim for 2,200,000 bricks, more or less, purchased by the State Prison Directors, and used in the construction of the State prison walls.

"And it is further covenanted, stipulated and agreed, by and between the said parties of the first and second parts, during the continuance of the term of this lease, that the said prison shall be governed, controlled

and managed in accordance with the provisions of an act entitled ' An Act creating a Board of State Prison Commissioners, and defining their duties,' approved March 21st, A. D. 1856.

"And it is further covenanted and agreed by the party of the second part, that at the expiration of the five years, he will quit and surrender the premises and property aforementioned, and all walls, prison, or prison buildings, and permanent fixtures of any and every kind, which he may erect on property now owned or occupied by the State, or which may be purchased or acquired by the State, for State prison purposes, to the party of the first part, or to such parties as the State may, by law, authorize to receive the same, in as good condition and state as reasonable use and wear thereof will permit, damages by the elements excepted, the property owned by the State, as described by schedule A.

" It is also stipulated and agreed, by and between the parties hereto, that, simultaneous with the execution of this contract, and prior to the same taking effect, the said party of the second part shall enter into a bond, payable to the people of the State of California, in the penal sum of $200,000, with responsible sureties, to be approved by said Board of Commissioners, conditioned for the faithful performance of the duties and obligations imposed by the conditions of this contract, and the law authorizing the same, and new or additional bonds may be required by said Board of Commissioners, if, from any reason, they shall deem the bond or bonds insufficient.

" In witness whereof, Robert M. Anderson, Lieutenant Governor of. the State of California, George W. Whitman, Controller of the State of California, and Henry Bates, Treasurer of the State of California, constituting the Board of State Prison Commissioners, and the said James M. Estill, party of the second part, have hereunto set their hands and seals, the day and year first above written.

" [SEAL.]                           R. M. ANDERSON,
" [SEAL.]      ·                    G. W. WHITMAN,
" [SEAL.]                           HENRY BATES,
                   " Board of State Prison Commissioners.
" [SEAL.]                           J. M. ESTILL.
" Witness : R. A. FISH.
    "A true copy :              WILLIAM WILLIS,
              " Clerk of Board of State Prison Commissioners."

*Thos. H. Williams, Attorney General,* for Appellant.

I.   The contract with Estill was unconstitutional : 1. As violating

the eighth article of the Constitution.  The State was in debt over $300,000 at the time it was made, and by its terms a liability is created against the State of $10,000 per month for five years, making $600,000.

A debt or liability may be created in many ways.  It may be done by express statute; by contract; by appropriation, when there is no money to meet it; by drawing on a fund which has not been set apart, or which in fact does not exist, etc.

In a word, whenever the faith of the State is pledged, either directly or indirectly, to the payment of a certain sum at a given time, or when the money may be in the Treasury, for a service rendered or to be rendered, then a debt or liability, within the meaning of the eighth article of the Constitution, has been created.  (*People* v. *Johnson et al.* 6 Cal. 499.)

The act under which it was made directed the Comptroller to issue his warrant each month to the lessee for such sum as the Commissioners should agree to pay him, and directed the Treasurer to pay the sum out of any money in the Treasury " not otherwise appropriated."

If, however, there was no money in the Treasury, subject to be used in payment of such warrant, it became the duty of the Treasurer, under the general laws, to endorse the same on the back, officially, with the date of such endorsement, and thereupon it became part of the indebtedness of the State.  (Compiled Laws, 361.)  And by this process of issuing a warrant in each month, by one officer, and endorsing it by another, at the end of two years, (supposing that all money coming into the Treasury had been otherwise appropriated) the State would have been involved in a debt of $600,000.

It is not pretended that the question, whether the contract should be made upon the terms authorized by the act, was ever submitted to a vote of the people; and under the authority of the *People* v. *Johnson*, and *Nougues* v. *Douglass et al.* 7 Cal. 65, it is clear that the warrants issued under the provisions of the act referred to would, to the extent of $600,000, have been void.  And as the act and contract clearly authorized the issuance of such void warrants, it seems therefore to follow, as a matter of course, that they both were void.  Had the act authorized a contract for $600,000, payable by monthly installments, or the entire sum at the end of five years, there could be no question as to its invalidity.  And a mere change of terms, working out the same results and tending to the same illegal consequences, cannot render that constitutional which before was not.  The Legislature cannot do indi-

rectly what it cannot do directly. (*Nougues* v. *Douglass,* 7 Cal. 69 ; 7 How. 458.)

Again; the contract was not binding on the State, because it leased the convict labor to Estill. This is in effect leasing a part of the sovereignty of the State, for confinement of persons by the execution of judgments of Courts is part of the administration of justice, and this pertains to and is part of sovereign power.

The State may place her prisoners in the custody of another, and by a contract, but he is a mere officer removable at will.

But it is said that the State had the power to lease the premises sued for, and having leased them, she had no right to resume possession without the consent of plaintiff, even though the remainder of the contract was void.

This proposition is untenable, even admitting the power to lease.

The main object of the State was to have her prisoners clothed, fed, safely and securely kept, etc., etc.

That of the lessee, to get the convicts' labor, and $10,000 per month; and with both lessor and lessee, possession of the premises was a mere incident, although an indispensable one.

The contract was one of dependent stipulations, and whenever one was abandoned or disregarded, its mutuality was destroyed, and a destruction of one part of it would necessarily work a destruction of the whole.

If one of the two contracting parties was never bound to do the act which formed the consideration for the promise of the other, the agreement was void for the want of mutuality. "The agreement must be obligatory on both, or it will bind neither." (Chitty on Contracts, 15 ; *Bates* v. *Corts,* 2 B. and C. 474, *Lees* v. *Whitcomb,* 3 C. and P. 289 ; *Marsh* v. *Wood,* 5 B. and C. 659 ; and 19 Johns. 204.)

"Mutual promises are concurrent considerations, and will support each other, unless one or the other be void; in which case, there being no consideration on the one side, no contract can arise." (Story on Contracts, sec. 447, and authorities cited.) And when an agreement is not binding upon one of the contracting parties, that party is equally at liberty with the other to disregard it.

If the portion of the contract leasing the prisoners was illegal, then, for that reason, the entire contract was void. (Chitty on Contracts, 692; Story on Contracts, secs. 458, 59, 60, 61.)

2. As not pursuing the terms of the authority under which it (the contract) was made.

The Commissioners who contracted with Estill were merely agents of the State for that purpose, and could only make such contract, and upon such terms as the act constituting them Commissioners expressly authorized. "The rule of law regulating the powers of such agents is, that the power must be strictly pursued, or their acts are void; and this rule is particularly applicable to public agents acting under statutory powers." (*Heydenfeldt* v. *Pickering*, October Term, 1854.)

"A contractor with an agent, by or under a law, must see to it that the agent strictly pursues his powers, and all are bound to notice the law." (*State of Illinois* v. *Delafield*, 8 Paige, 529. And the same principle is established in *Malcolm* v. *Rogers*, 5 Cowen, 193; 23 Wend. 260; 3 Hill, 270; and 5 Johns. Ch. R. 101.)

The act authorized them to lease the State prison grounds and property, together with the convict labor of this State, and to contract for taking care of the convicts, feeding, clothing and providing them with medicine, recapturing those who might escape, and erecting such buildings as would conduce to the safe-keeping, etc., of the convicts, and nothing more.

A maximum, but no minimum, price was fixed.

It was, undoubtedly, supposed and intended that the lowest responsible and suitable bidder should be awarded the contract. But the expectations of the Legislature and of the people were defeated. The Commissioners exceeded their authority. Instead of confining themselves to the letter of the act, they went beyond it, and agreed to give Estill the enormous sum of $10,000 per month, for five years, in consideration of his doing the matters and things before enumerated, and of a release by him to the State of all claims which he had against the State, arising out of his former connection with the State prison; also a claim of $48,000 for property purchased by the State Prison Directors from Archibald Woods; also a claim for 2,200,000 bricks, used in the prison wall.

II.   If the contract was valid, the assignment was void.

The act, neither in terms nor by fair implication, authorized a contract assignable. On the contrary, every expression used in reference to the lessee seems to contemplate that the State is only to deal with and recognize, during the five years of its continuance, the party therein named as the contractor.

"It involved a personal trust, granted by the sovereign, upon conditions imposed upon the grantee (lessee) alone, and his liability could not be removed by substitution." (*Munroe* v. *Thomas*, 5 Cal. 470.)

It was a sort of office created by the Legislature to be filled by an appointment made by the Commissioners, and could no more be assigned than any other similar trust reposed by the Government in any particular individual.

The lease of the premises, so far as it might be regarded separately from the office, created an interest or estate in the lessee similar to that held by a pre-emptor or grantor of a land warrant under the General Government; and it has always been held that such interest is not assignable unless the Act of Congress, under which it is claimed, expressly authorized such transfer.

Again, if the assignment was legal, the assignee, and he alone after notice, would be entitled to demand and receive the Comptroller's warrants for $10,000 in each month, and yet it has never been the practice of either the General or State Governments to recognize such transfer. They should not be required to do so; for if such practice was necessary, the officer's entire time might be taken from his legitimate duties, and consumed in examining testimony and settling disputed claims to the fund, and he might be exposed to the unpleasing alternative of paying out at his peril.

Look, too, at some of the consequences flowing from an adverse construction.

If the contract was not a mere personal trust, and the lease of the premises a mere incident, and the whole assignable, then there is no reason why the creditors of Estill could not have levied upon his leasehold interest, and sold the same under execution; and why, under our statute, they might not have gone further and sold his interest in the claim against the State, and perhaps his interest in the contract, thereby defeating the very object of the statute.

If the assignment was valid, who would be entitled to the possession of the prison and control of the prisoners, in case of McCauley's death? Neither the State nor Estill could come in and claim as reversioners, because they had each parted with all the control until the lapse of the five years. McCauley's executors and administrators would be the sole parties entitled to possession; and in case of the death of these latter parties, such others as the Probate Laws should designate.

III. As to whether the instrument in question is a contract or lease, see *State* v. *Page*, 1 Speers, 408. As to whether the contract is an entirety, and its stipulations dependent, and whether the State had a right to rescind it for non-performance on the part of Estill, see 2 Wend. 433; 3 Hill, 344; 25 Ala. 465; 6 Porter, 344; 9 N. H. 298.

State of California *v.* McCauley.

The following list of authorities the Attorney General filed, as being those prepared and used by Gregory Yale, as associate counsel for the State, on the argument of the case in the Court below—Mr. Yale being absent from the State when the case came before this Court:

Right of Attorney General to institute the action *ex officio*, without legislative direction.  (*Com.* v. *Fowler,* 10 Mass. 293–4; *Com.* v. *Burell,* 7 Barr, 41; *Com.* v. *Union Ins. Co.* 5 Mass. 232; *State* v. *Delesdier,* 7 Texas, 94–5; *Bush* v. *Cavenaugh,* 2 Bur. 189; *Attorney General* v. *Norwood,* 2 Harris & McHenry, 201, 213; *Id.* 1 Bland, 581; *Com.* v. *Theobald,* 11 B. Monroe, 224; *People* v. *St. Louis,* 5 Gillman, 366–7; Acts of February 28th, 1858; April, 1858; *McCauley* v. *Weller; Cor. Georgetown* v. *Alex. Carrol,* 12 Peters; *Carter* v. *May,* 5 Cushing.)

Jurisdiction of the Court—Injunction where public are interested. (*Putnam* v. *Valentine,* 5 Ohio, 187–9.)

Information to set aside a patent and deliver possession of real estate. (*Attorney General* v. *Norwood,* 2 H. & McH. 213–14; 1 Bland, 581.)

Corporation sues, and real estate in possession of defendant demanded. (*Oakland* v. *Carpentier,* 13 Cal. 540.)

Specific chattel of intrinsic value to be delivered up, and of which no damage can be assessed.  (*Fells* v. *Read,* 3 Ves. 70, and note to 70 and 72; 2 Sto. Eq. secs. 709, 906.)

Family servants specifically decreed.  (*McRhea* v. *Walker,* 4 How. Miss. 455.)

Injunction, Pr. Act, sec. 112—Waste stayed without *lis pendens.* Liberality of chancery—no ejectment necessary before injunction.  (*Kane* v. *Vanderburgh,* 1 John. Ch. 10–11.)

Covenant to repair and surrender the buildings in good condition at end of term does not preclude an injunction to prevent the carrying away materials.  (*Mayor of London* v. *Hedge,* 18 Ves. 355.)

Sub-lessee may be prevented from converting premises inconsistent with the lease.  (*Maddox* v. *White,* 4 Md. 78–9.)

Or from change of business.  (4 Sand. Ch. 591.)  Same rule.  (*Howard* v. *Ellis,* 4 Sand. Sup. Ch. 369.)

Denial of plaintiff's title no reason against injunction.  *Clam* v. *Brewer,* 2 Cart. 518.)

Defective bill, as to subject and parties, no reason why receiver should not be appointed and injuction granted.  (*Evans* v. *Coventry,* 31 L. & Eq. 438.)

29

State of California *v.* McCauley.

Equity more potent than the law, to grant the remedy and prevent the wrong. (*Osborn* v. *U. S. Bank*, 9 Wheat. 445.)

Insolvent obligor need not be a party. (Sto. Eq. Pl. secs. 169, 170.)

Contract for defined work, in which the plaintiff has an interest, not to be compensated in damages—enforced. (*Storer* v. *W. Railway Co.* 21 Eng. Ch. 48.) Same. (*Stuyvesant* v. *Mayor of New York*, 11 Paige, 427.)

And to build a house to correspond. (*Franklin Suton*, 5 Mod. 285.)

Receiver, Pr. Act, 143—Appointment determines no right—only preserves the property. (*Evans* v. *Coventry*, 4 Wend. 173; 31 L. & Eq. 438.)

Affidavits—Supplement to Dewery on Injunctions. (6 Law Libs. 101–4.)

If a lease—Assignment of a void contract conveys no interest to assignee. (*Andrew* v. *Pierce & Mansfield*, 1 New Rep. 152–3.)

Agreement to surrender at end of term makes sub-lease not assignable. (*Post* v. *Kearney*, 2 Comst. 396; 3 Sand. Ch. 668.)

Under tenant not bound on lessee's covenants; no privity of estate or contract. (Taylor's L. & T. 222; 1 Platt, 102; Brief, 8–9.)

Continuing covenants. (*Bleeker* v. *Smith*, 13 Wend. 530–2.)

Assignee·not bound for covenants for a thing not *in esse*, nor in relation to personalties. (*Spencer's case*, 5 Coke, 16.)

Same, as to covenants of a thing not *in esse*. (*Tallmow* v. *Coffin*, 4 Comst. 136.) Same. (2 Platt on Leases, 401, 405–6.)

An assignee, if whole term is gone. (*Smiley* v. *Van Winkle*, 6 Cal. 106.)

Not demisable property—No lease of an office pertaining to the administration of justice, as the custody of prisoners, or marshal, to heirs and assigns. (1 Platt, 25–6, note *y ; Reynolds' case*, 9 Coke, 174; *Sutton's case*, 6 Mod. 57 ; *Ellis* v. *Audle*, 2 Levins.)

Neither successor nor executor of Warden of State prison compelled to prosecute suit commenced by him before his death. None but a successor can have any relation to the contract under the statute. (*Bradford* v. *Reese*, 3 Pick. 18.)

Not a lease, but a contract—Ouster of plaintiff under a contract to repair mill and keep it till profits pay for the work, not a lease, and defendant not liable as landlord in forcible entry. (*People* v. *Gibbs*, 24 Wend. 200–2.)

Definition of a lease. (*Jackson* v. *Harrison*, 6 Cow. 327–6.) Same. (1 Platt, 9.)

A contract to let rooms in a boarding house, and for board and lodging, not a tenancy.   (*Wilson* v. *Martin*, 1 Denio, 664–5.)   See above. (*Bradford* v. *Rowe*, 3 Pick. 18.)

An interest in half the crops no tenancy, nor partnership.   (*Aiken* v. *Smith*, 21 Vert. 180; *Putnam* v. *Wise*, 1 Hill, 246–7.)

Limitations to authority of public agents in making contracts—Leasing prison by agent of State prison, without giving the notice required by statute, void, and no action can be sustained against the agent.   (1 Manning, 458.)

*Crockett & Crittenden*, for Respondents.

I.   The Act of the twenty-first of March, 1856, is not void.

1. The act did not create any debt or liability for the amount of the appropriation within the meaning of the Constitution.

The case is not within the principle of the decisions in the *People* v. *Johnson* (6 Cal. 499) and *Nougues* v. *Douglass* (7 Id. 65).

The history of this contract demonstrates the distinction.   The $10,000 per month was for a long time paid, and no debt was contracted.   Then the State seized the State prison, and now denies that there exists any liability on the contract, insisting that the other party did not perform, and that therefore no liability accrued on her part.

The error in the reasoning of the Attorney General seems to us to be in supposing that no appropriation or provision for the payment of money could be made, whether to take effect presently or at any future time, when there existed, at the time of the passage of the law making the appropriation or provision, an indebtedness, on the part of the State, exceeding $300,000 in amount, and this, though both the services and consideration from which the payment was to come, were to be then, or at a future period, rendered or performed.   It must be borne in mind that this service was necessary to the support of the Government, and one of its ordinary sources of expenditure; that the Government is just as much bound to support its convicts as its officers; that the salary of the Governor, or the Judge, is not more properly or necessarily a governmental charge than the food, clothing and safe-keeping of its criminals.   If, then, the passage of a law fixing the price to be paid for keeping the prisoners—the keeping and the payment for it being future acts—be a debt in the sense of the Constitution, what becomes of the salary of the Attorney General, of the Judges, or Governor, fixed by law—the indebtedness of the State, at the time of such fixing, being

beyond the constitutional limit ?   Nay, what becomes of all salaries of all officers, or of the compensation of the members of the Legislature? If the doctrine contended for be true, it logically follows that no salaries or compensation can ever be provided beforehand, for future services, when the State is in debt—as she now is—over $300,000 of unprivileged indebtedness ; for the reasoning is, that such future compensation is a debt, and that the consideration for it being in the nature of a contract, the creation of the contract amounts to the creating of the debt. But the mistake of the argument would be readily detected when an attempt was made to apply it in the instances cited.   It would be readily answered, in the case of a Judge elected for six years, in this wise : The Judge would say : "You merely agree to give me so many dollars when I earn them ; you do not owe them until I perform the services, or the time elapses within which I am to perform them." The Legislature is bound to make the appropriation according to the law in force, but no debt is created.   There is, indeed, a state of things provided for, out of which a debt or charge may arise.   Whether this be 'by contract made with the Judge, or implied, is immaterial.   The State does not owe the Judge the six years' salary ; he may never earn it ; he may die or resign the next day ; but if he does not resign, but serves as Judge, then the appropriation follows, and he receives the money.   So in this case, the lessee never could have claimed of the State, at any one time, $600,000—the aggregate of all the installments.   At the time of making the contract, and by force of the contract, he was entitled only to draw money as the periods for payment occurred.   If he had died, or refused to go on with the contract, his sureties, or he—as the case may be—might have been liable on his bond, indeed, but he or his representatives could have recovered nothing afterward.   Why ?   Because then the State owed him nothing.   He had placed himself in such a position as that the State might have owed him, and having the money in the Treasury would have been bound to pay him ; but still, as in the case of a salaried officer, it was not a debt until the time arrived, and the event happened.   The State cannot be considered as incurring a debt for current expenses, when it has the money to pay ; if so, it has been incurring debts all along, to all of the officers.   Every appropriation, in this sense, supposes a debt—an obligation to pay money—but this, obviously, was not the meaning of the Constitution.   We presume there would be no objections, on constitutional grounds, to the first Legislature passing a law providing for the payment of the expenses of the

State of California v. McCauley.

Government ten years in advance—the appropriation taking effect when there was money in the Treasury to pay. But it would hardly be contended, if the bill had appropriated $100,000 per annum for the support of the penitentiary, in monthly installments, that there was a debt incurred by the State, any more than fixing the salaries of so many Judges, amounting to that sum, was a debt incurred to them. In order to make the matter clearer, let us suppose that the State had, in 1856, passed a law creating an officer called "Warden of the Penitentiary," and required him to execute a bond to discharge the duties, and fixed his compensation at $10,000 per annum, payable monthly, does any one doubt that he would be entitled to that sum, or suppose that this law would create an unconstitutional debt? But suppose it had required a contract from him to furnish the prisoners with food, etc., and in consideration of this, had agreed to pay him, for five years, so much money, payable monthly, why would this provision be unconstitutional? Not, surely, on the ground of contract; for the Constitution says nothing against that, and the contract is implied, indeed expressed in the appointment—the contract is merely incidental to, and illustrative of the appropriation. There is no reason or rule which prevents the mere act of appropriation or designation of the sum of money to be paid, from being passed before the money is in the Treasury, if it takes effect only when the money is ready to meet it. If no money was in the Treasury, but expected, from taxes or income, to be there by a given time, we do not see why provision for its payment should not be made, as well in advance of its actual receipt as at any other time, if it is only to take effect when received; and this is the usual order of procedure in other States, if not indeed in this.

The mere contract, express or implied, to pay money for necessary expenses, at a future day, on certain conditions, express or implied, for services to be rendered or articles furnished, therefore, is not an infraction of the constitutional provision. To make it such, there must be an absolute agreement to pay money in any event, with immediate or at least a fixed liability on the part of the State to pay it. This was the evident spirit of the Constitution. Section eight was not designed as a restriction upon the power of appropriating money, or of disposing of property by the Legislature. It was not a mere police regulation as to the time when acts were to be passed. It was designed to prevent the Legislature running the State in debt—to make, except in certain cases, her revenues support the Government; but whether those revenues are

appropriated to-day or to-morrow, when in the Treasury or on the way to the Treasury, whether actually raised or expected to be raised when needed, is wholly immaterial. It would be just as constitutional to appropriate $10,000 for stationery to be furnished the next Legislature, at the next session, to be paid out of the next year's taxes, as to appropriate it out of the money now in the Treasury; and a contract to furnish it then at certain rates, to be then paid for, would seem to be legitimate. So it was, in like manner, perfectly constitutional to say that the officers of the Government should pay to the lessee of the State prison so many dollars for taking care of the penitentiary in the year 1858, as it was constitutional to say that the officers of the Government should pay to the physician of the insane asylum so much money for taking care of the insane for the same period. The contract, though dated in the present, was to be performed in the future; and the money to be paid was not a debt until the time came, and the event happened, upon which payment depended; and when the sum designated became due by the act, the money was in the Treasury and subject to the law, and no debt existed against the State, any more than in the case of any salary of physician, Judge, or Governor.

Suppose the State prison were taken possession of by the State, and conducted under its management and direction; could not the State order contracts for supplies? Could not she employ wardens, attachés, servants, etc., and incur the usual liabilities for future services and current charges in advance of a revenue to meet them? Indeed, if the argument be pursued to its consequences, it would make no difference whether she had the money on hand or not, as there would still be a debt. So the State could make no contracts for selling or disposing of its property, or the articles made by convicts, in advance of their manufacture, for still the law might raise an obligation to refund or to pay, on failure of compliance. It will be seen that this would make government almost an impracticable thing, and introduce hopeless confusion into its affairs.

The Government cannot move without incurring, every hour, charges on its Treasury of some sort or other; but it must be as constitutional to provide for these in advance as to pay them subsequently, and whether provision be made by a contract to pay or an implied assumpsit—by an appropriation in advance or subsequently—is the same thing. These charges are, in no constitutional sense, debts; the money is not to be paid, therefore is not due (or a debt) until the service is performed, or

the thing done. When it is due, it is paid for out of funds already provided and in the Treasury: precisely as every salary or item of expenditure for the support of Government.

And if this contract were taken from the lessee, the Legislature must go on, and, in effect, make another equally unconstitutional; it must agree to pay the warden or lessee so much, which is a contract; and then must authorize him, or some one else, to procure food, clothing, materials, utensils; to make contracts for buildings or repairs, etc.; so that the only difference would be to change one contract with one man into a multitude of contracts with many men.

Let us suppose that the State, instead of making general appropriations for the expenses of the several departments, should provide for contracts in this wise: that she should agree to pay the Surveyor General, the Secretary of State, etc., so much money, payable at certain periods, for defraying the expenses, etc., of their respective offices—what would be the difference between this and agreeing to pay, or appropriating in advance so much money for the purposes of such departments? It would at last, whether in the form of a contract or not, be only providing for expenses of Government in advance of their payment. And so it is in respect to the State prison.

To hold the contrary, is to hold that the State cannot rent a Capitol by contract, to be paid for by the month, or a Supreme Court room and offices; and the Legislature would be violating their oaths to authorize, or possibly even to pay the sums necessary for these purposes. To such manifest absurdities does this proposition lead! Besides all this, it may be asked, if all the indebtedness, heretofore existing, was unconstitutional—and therefore no State debt at all—when did the indebtedness pass the constitutional limit? How is it shown that it was exceeded when this contract was made?

2. But even if the act did create a debt or liability in violation of the Constitution, it would therefore only be void to that extent. It would still be valid so far as to authorize the making of the contract and the transfer from the State to the lessee of the property of the State, and the custody of the convicts and the profits of their labor. The unconstitutionality of the law would only protect the State against a demand for the money due under the law, but does not at all countenance the pretension that no right to the possession of the property could arise under the law.

Strictly speaking, the question of the unconstitutionality of the law

on this ground is not involved in this action, for there is no demand here made for the money. The State is not seeking to relieve itself from a liability for the money, but only to regain possession of the property.

3. The labor of the convicts is the legitimate subject of contract. Conviction and imprisonment create a constitutional involuntary servitude—in other words, slavery. If the State can hire the labor of a convict for a single moment, it can do so for five years. It is the exercise of that power of disposition which of necessity exists in the State, and it is purely a matter of legislation how it shall be exercised. The State is entitled to the profits of the labor of convicts, and it is for the Legislature alone to determine how that profit shall be derived. The practice of almost every State in the Union confirms this, and it was never before denied.

II.   The Commissioners did not exceed their authority by procuring the release of the claims of Woods and Estill. They kept within the limit of their power and made a better bargain for the State than was anticipated.

Even if the Commissioners had exceeded their authority, the State is estopped from alleging it after so long a time has elapsed, and after the contract has been in part performed on both sides. The State has acquiesced in and affirmed the contract, with full knowledge of its terms.

III.   The assignment of the contract did not avoid it.

The law gave the Commissioners power to make a lease in the usual form. Every lease is assignable, unless there be express words of restriction.

The assignee, whether named or not, is bound by all the covenants running with the land.

Whether assigned or not, the State has the security it chose to take. If it did not choose to bind the assignee, it cannot complain.

Every lessee has the right to sub-let unless restrained by his lease. McCauley is merely a sub-lessee.    (Taylor's Landlord and T. 279.)

Notwithstanding the assignment, the State may enforce the contract against Estill.   That it cannot do so against McCauley is no ground upon which it can ask relief.   It is the result of its own contract, and no doubt the contingency of an assignment was in view when the lessee was required to give bond in the sum of $200,000.   The State holds that security, in addition to the personal responsibility of the lessee.

State of California *v.* McCauley.

To ask relief because under the contract there are certain covenants on the part of the lessee which would not bind the assignee, or because none of the covenants bind McCauley as sub-lessee, is to ask the Court to relieve the State from its contract, merely because the usual incidents and consequences of such a contract are found to follow from its execution, or because the contract did not contain unusual restrictions upon the lessee, which might perhaps have been advantageous to the State.

IV.   The death of Estill did not terminate the contract.

It would be as rational to contend that a lease for years of land and slaves made by one individual to another, would determine on the death of the lessee.

V.   If the contract be valid, the alleged breaches do not entitle the State to rescind it.

1. Because the right to abandon a contract vests only in the party who has been guilty of no default.   (Chitty on Cont. 636.)   And the State was in default by not paying the money according to the terms of the contract.

2. Because the application is too late.   When a right of rescission exists, it must be exercised within a reasonable time.   (Chitty on Cont. and Cases, 636; *Ayers* v. *Mitchell,* 3 Sm. & M. 683; *Mason* v. *Bovet,* 1 Denio, 74; Story on Cont. sec. 844, *c.*)

3. Because the contract has been in part performed, and the parties cannot be restored to their original position.   The right of rescission can never be exercised under such circumstances.   (Story on Cont. sec. 844, *a;* Chitty on Cont. 636, *a;* 2 Parsons on Cont. 191–2–3; *Voorhees et al.* v. *Earl et al.* 2 Hill, 288; *Hunt* v. *Silk,* 5 East. 449; *Mason* v. *Bovet,* 1 Denio, 69–74; *Beed* v. *Blandford,* 2 Young & Jer. 278; *Turnp. Co.* v. *Commonwealth,* 2 Watts, 433.)

4. One who asks equity must do equity.   The complaint shows that there is money due to the defendants on the contract; yet there is no offer to pay it, nor any offer to return what was received when the contract was entered into.   This would be essential to any relief being given to the plaintiff.   (1 Story's Eq. sec. 301; *Fanning* v. *Dunham,* 5 Johns. Ch. R. 142; 17 Johns. R. 57.)

Field, C. J. delivered the opinion of the Court—Cope, J. concurring.

On the twenty-first of March, 1856, an act was passed creating a

Board of State Prison Commissioners, and constituting the Lieutenant Governor, the Controller and the Treasurer of the State such Commissioners. By the act, the Commissioners were, among other things, required to lease the State prison grounds and property, together with the convict labor, for a period of five years, at a price not exceeding $15,000 a month; and to provide, in any contract made by them, for the erection, at the expense of the lessee, of such buildings and improvements upon the property leased as would conduce to the convenient and safe keeping and working of the convicts, and to take from the lessee a bond in the penal sum of $200,000, with two or more good and sufficient sureties, to be approved by the Board, conditioned for the faithful performance of his contract.

Under this act, and assuming to be governed by its provisions, the Commissioners, on behalf and in the name of the State, on the twenty-sixth of March, 1856, entered into an indenture of lease with James M. Estill, by which, in consideration of the covenants and agreements contained therein on his part, the State granted and demised to him and his assigns, for the period of five years from that date, the prison grounds and property, together with the labor of all the convicts then in the prison, or who might be confined therein during the continuance of the lease, and agreed to pay to him the sum of $10,000 a month; and the said Estill, on his part, covenanted and agreed, in consideration of such lease, and the payment of such monthly sum, to receive and take charge of the convicts then confined in the prison, or who might be thereafter confined during the said period; and to provide, under the direction of the Commissioners, the necessary overseers, guards and employés for the prison, and to furnish the convicts with suitable, proper and wholesome food, drink, clothing and medical attendance, and to treat them humanely, and with all the kindness consistent with their security and safety; and to erect such buildings, prisons and walls, and to make such other improvements on the premises, as would conduce to the convenient and safe keeping of the convicts; and to use due diligence for the capture and recovery of such as might escape, and to pay reasonable rewards for their apprehension and return. The lessee also further covenanted and agreed, for the same consideration, to release, and by the instrument did release, all claims against the State of California, whether legal or equitable, which he held, arising from his former connection with the State, as the lessee of the prison and convict labor, or for property or materials sold to or

used by the State officers or employés of the prison for the State; and also, a claim for $48,800 for property purchased by the State Prison Directors, or other State officers, from Archibald Wood, and to hold the State harmless from such claim; and also, a claim for two million and two hundred thousand bricks, purchased by the State Prison Directors, and used in the construction of the prison walls.

It was also stipulated by the contract, that simultaneously with its execution, and prior to its taking effect, the lessee should execute to the State a bond in the penal sum of $200,000, with responsible sureties, to be approved by the Commissioners, conditioned for the faithful performance of the duties and obligations of the contract, and the law authorizing the same; and that new or additional bonds might be required, if, from any reason, the Commissioners should deem the bond or bonds taken insufficient.

Immediately upon the execution of this lease and contract, Estill took possession thereunder of the prison grounds and property, and of the convicts confined in the prison; and continued in such possession until the fourteenth of May, 1857, when he transferred and assigned to McCauley all his interest, rights and privileges under the contract, until the twenty-sixth of February, 1861, with the exception of the right to draw one-half of the monthly sum stipulated to be paid by the State, the lessee reserving to himself that right.

On the twelfth of January, 1859, Estill transferred and assigned to the defendant, Tevis, all his remaining interest in the contract, and in and to all moneys then due, or which might thereafter become due on account thereof.

From the time Estill took possession, until the twenty-sixth day of December, 1857, warrants for the monthly instalments, payable under the contract, were drawn by the Controller upon the Treasurer of the State, and delivered to the lessee or his assignee. The complaint alleges, that up to the period of the assignment to McCauley, the State complied with the contract, so far as to pay to the lessee the sum of $10,000 a month; and that the amount of $210,000 in all has been paid upon the contract. This amount brings the monthly payments to the twenty-sixth of December, 1857. As to these allegations of payment, the answer avers, that on the twenty-first of April, 1856—within one month after the contract was made—an act of the Legislature was passed, prohibiting the Treasurer of the State from paying any money for the redemption of Controller's warrants, bearing date prior to the

first of January, 1857, or of a later date, drawn for any indebtedness which accrued prior thereto; and that on the nineteenth of the same month, an act was passed providing that all such warrants should be funded and bonds of the State, payable on the first of July, 1875, issued in lieu thereof, (See laws of 1856, chaps. 137 and 149), that under the authority of these acts, the Treasurer refused to pay the warrants issued to Estill previous to the first of January, 1857, and in order to provide the means of keeping and maintaining the prison, Estill was obliged to sell them in the market, or have them exchanged for the bonds of the State, and to sell the bonds; and that both the warrants and bonds were greatly depreciated, and he was forced to dispose of them at a discount of from thirty to fifty cents on the dollar; that after the first of January, 1857, the warrants were not issued as the monthly amounts became due, except on one or two occasions, the Controller refusing to issue them until there was money in the Treasury; and that Estill, previous to the assignment, and McCauley afterwards, were forced to sell their demands for the monthly payments, allowed by the Board of Examiners, at a heavy discount. Since the twenty-sixth of December, 1857, no warrants have been issued for any of the monthly instalments, nor have any payments been made on the contract, but, on the contrary, the payments have been expressly refused.

On the twenty-sixth of February, 1858, an act was passed authorizing and empowering the Governor of the State, and in fact, making it his duty, through such agent or agents as he might appoint, to take immediate possession of the State prison and grounds, together with all the property of the State therein situated; and to assume the custody, control and management of the State prison convicts therein confined, or to be therein confined, and thereafter to continue the possession of the property, and the control of the convicts, until further provided by law. At this time, McCauley was in the peaceable possession of the property and convicts, but the Governor, believing the act to be constitutional and binding upon him, proceeded and took forcible possession of the premises, ousted McCauley therefrom, and retained possession until restitution was made by a regular judgment, rendered in judicial proceedings, instituted by McCauley against him and others. This Court, in considering the judgment on appeal, held that the validity of the lease could not be tried in an action of forcible entry and detainer, and that McCauley could not be deprived of the advantages resulting

State of California *v.* McCauley.

from the possession of the premises, by a forcible ouster, under any legislative enactment; that if the lease were valid, there was in him a property which could not be divested for public use, without just compensation; and if it were invalid, it still gave a color of title, and took from his possession the character of intrusion without claim of right, which alone the Government could remedy by force.

On the twenty-sixth of April, 1858, which was after the seizure by the Governor and the dispossession of McCauley, and before any legal proceedings for the recovery of the premises were taken, an act was passed, entitled "An Act to authorize the settlement of the accounts of James M. Estill and John F. McCauley, arising out of State prison matters"—by which the Governor, Controller and Secretary of State were constituted a Board of Commissioners, with power to examine, audit and allow any and all claims, legal or equitable, of Estill and McCauley or either of them (except only one of McCauley's) arising out of any matters connected with the State prison; and for that purpose to take evidence, and to hear counsel for or against any such claim. The claim excepted was one of $20,000, preferred by McCauley for keeping the prison from December 26th, 1857—the period to which the State had made the monthly payments—up to March 2nd, 1858, the day on which he was forcibly dispossessed by Governor Weller and others. The act provided, that the award of the Board should be in writing, and be final and conclusive between the State and Estill and McCauley; and when it was filed with the Secretary of State, it should be the duty of the Controller to draw his warrant on the Treasurer in their favor for the amounts awarded to them respectively—*provided,* they executed and delivered to the Board, before receiving such warrants, full and complete releases of all their claims against the State, arising out of, or in connection with the State prison, with the exception of the claim above mentioned of $20,000, preferred by McCauley; and *provided,* they first made a good and sufficient fee-simple title to the site of the premises upon which the buildings stood, in front of the east wall of the prison. For the payment of the amounts awarded, the act appropriated and set apart the sum of $75,000. To this act neither Estill or McCauley ever paid any attention. They never consented to the appointment of the Commissioners, or presented any claims to them. They rested upon the validity and legality of the contract, and denied the right of the State to withdraw from its obligations; asserting at the same time, that their claims, exclusive of the one excepted by the act,

greatly exceeded the sum appropriated for their payment; and that they neither possessed or had control of the title to the premises which the act required them to make to the State, as a condition precedent to any payment.

On the nineteenth of April, 1859, an act was passed to condemn and appropriate to the use of the State, the interest of Estill and his assigns in the State prison grounds and property, but owing to some question, it is believed, as to the constitutionality of its most material provisions, no proceedings were taken under it on behalf of the State.

In July following, the present suit was instituted. Its object is to obtain a cancellation of the lease and contract with Estill, and the assignment thereof, and a surrender of possession to the State of the prison, grounds and property pertaining thereto, and of the convicts. Other relief, by way of injunction against threatened legal proceedings of the defendants, and by the appointment of certain directors or receivers, to take charge of the property and convicts pending the action, is also sought, but these matters are only incidental to the other objects of the bill.

To maintain the action and obtain the decree prayed, the plaintiff alleges and relies upon several grounds: 1st. The unconstitutionality of the Act of March 21st, 1856, directing a lease of the prison and convicts. 2nd. The want of authority in the Commissioners, even if the act were constitutional, to make the lease and contract in question. 3rd. The defective execution of the contract, the same being signed by the Commissioners in their individual names, and not in the name of the State. 4th. The forfeiture of the lease and contract, by the assignment to McCauley; and 5th. A failure on the part of the lessee and his assigns, to perform the covenants and agreements of the lease.

1. The unconstitutionality of the Act of March 21st, 1856, is asserted on two grounds: 1st, that it appropriated the sum of $600,000, and thus created a debt or liability against the people of the State, exceeding the limit prescribed by the eighth article of the Constitution; and 2nd, that it authorized a transfer of the convicts to private individuals, and a lease of the labor of future convicts, which was beyond the power of the Legislature.

The contract provides for the payment of ten thousand dollars a month, and the act appropriates this sum per month. The appropriations are to take effect, and the services are to be rendered in future. Until the services are rendered, there can be no debt on the part of the

State of California v. McCauley.

State. The lessee could not have claimed, at any time after the making of the contract, the aggregate of all the monthly instalments—because the State never owed him that amount. The State only became indebted as the services were each month performed. The aggregate amount of the salaries of the Judges of the Supreme Court, and of the several District Courts of the State, will exceed, during the period of six years for which they are elected, the limit of three hundred thousand dollars fixed by the Constitution, and yet it will hardly be contended that an act of the Legislature appropriating the money for their salaries, as they respectively became due, would be for that reason unconstitutional. Yet the argument of the Attorney General is as applicable in the one case as in the other. The support of the convicts is as much the duty of the State as to provide for the salaries of her officers. It constitutes one of the ordinary sources of the State's expenditures, and a law authorizing a contract for keeping the prisoners at a fixed price—the payment and the services being future acts—is no more in conflict with the Constitution than the law fixing the salaries of the Judges and other officers of the Government, and providing for their payment from the Treasury of the State. The eighth article was intended to prevent the State from running into debt, and to keep her expenditures, except in certain cases, within her revenues. These revenues may be appropriated in anticipation of their receipt, as effectually as when actually in the Treasury. The appropriation of the moneys, when received, meets the services as they are rendered, thus discharging the liabilities as they arise, or rather anticipating and preventing their existence. The appropriation accompanying the services operates in fact in the nature of a cash payment.

The objection to the constitutionality of the act on the second ground—that it authorizes the transfer of the convicts to private individuals, and a lease of the labor of future convicts, is untenable. The power over the whole subject of punishment for crime is vested in the Legislature. The only limitation upon its exercise is the inhibition against the infliction of cruel and unusual punishments, which are held to mean those of a barbarous character, and unknown to the common law. The first object of punishment is the protection of society; the reformation of prisoners is only subsidiary and incidental to this. Their conviction has subjected them to a constitutional, involuntary servitude; and their labor and the proceeds of it belong to the State, and may be disposed of in such way as the Legislature, in its discre-

tion, may determine. The practice of leasing out the labor of convicts prevails in several, and as we are informed, in a majority of the States; and the power of the Legislature to authorize contracts of this kind has never, we believe, been questioned. The rights of every lessee must, of course, be subordinate to the right of the Governor to pardon, and thereby discharge convicts from custody; and to such modifications in the extent of punishment as may be made by future legislation.

2. Whether the Commissioners did or did not exceed their authority in making the contract in question, it is unnecessary to determine. They were authorized to contract at a price not exceeding fifteen thousand dollars a month; they made the contract for ten thousand dollars a month. Had the contract stopped here, the objection would not have been urged. It is the additional stipulations for releases of claims against the State which constitute the point of objection. It is said that these claims entered into the consideration of the contract, in fixing the sum of ten thousand dollars a month, and that the sum would have been less but for these extraneous matters. If this be true, it is too late to raise the objection at this day—three years after its execution, and after it has been in part performed on both sides, and thus acquiesced in and affirmed.

3. The contract was not defectively executed by the Commissioners, from the fact that they signed it with their individual names, and not with the name of the State. The contract purports, in its body, to be between the State, acting by the Commissioners, under the Act of the twenty-first of March, 1856, of the one part, and Estill on the other, and is signed by the Commissioners, with the affix of " Board of State Prison Commissioners." The instrument does not purport to be the act of the Commissioners alone, but the act of the State by them. The State, by them, makes the lease and contract, and it is with the State that the lessee enters into the covenants and agreements contained in the indenture.

The objection is applicable only to contracts of a private character, made in cases of a mere private agency. A different rule exists in reference to contracts executed by agents of the Government. " In such cases," says Mr. Justice Story, in speaking of the liability of pub-'lic agents, " the presumption prevails that the parties contract, not personally, but merely officially, within the sphere of their appropriate duties. Thus a charter party, sealed and executed by a public officer in his own name, but describing himself as acting in behalf of the King

State of California v. McCauley.

or Government, for purposes connected with the public service, has been held not to bind him personally, but to be merely obligatory upon the Government.   So an indenture, executed between A B, describing himself as " Secretary of War," of the one part, and C D, of the other part, for a demise of certain buildings for public purposes, and for a certain period, and containing a covenant on the part of A B to pay the stipulated rent during that period, has been held not to bind A B personally, but to bind the Government alone."  (*Unwin* v. *Woolseley*, 1 Term R. 678; *Macbeath* v. *Haldimand*, Id. 172; *Hodgson* v. *Dexter*, 1 Cranch. R. 345.)  " Where a contract," says the Supreme Court of Maine, in *Stinchfield* v. *Little*, " is entered into, or a deed executed, in behalf of the Government by a duly authorized public agent, and the fact so appears, notwithstanding the agent may have affixed his own name and seal, it is the contract or deed of the Government, who alone is responsible, and not of the agent."  (1 Greenl. 231.)

4. The lease was not forfeited by the assignment.  The law authorized the Commissioners to execute a lease, and prescribed no specific form, and the lease is in terms made to Estill and *his assigns*.  No objections to this form of the contract were made at the time, and it is too late to interpose them now, after the contract has been acted upon on both sides, and been thus adopted and approved.  The personal liability of the assignor continued after the assignment.  The security of the bond of two hundred thousand dollars was in no respect impaired thereby.

If it be admitted that some of the covenants do not bind the assignee, no ground of relief can spring from this circumstance.  The State can claim no greater exemption than an individual, from the usual consequences of an unwise and impolitic contract.

5. It follows from the views we have expressed, that the Act of March 21st, 1856, was constitutional, and that the contract under it was valid and binding upon the State.   It only remains to consider the alleged failure of the lessee and his assignee to perform the covenants of the lease, as furnishing ground for the equitable relief sought by the bill.   The breaches alleged to have been committed are fully controverted by the answer, into which we can look in considering the action of the Court in refusing the preliminary injunction.  As to the demurrer, we must look to the case made in the complaint, and we are clear that the State is not entitled to a rescission of the contract upon her own showing.  In the first place, she has equally failed to perform the

30

contract on her part. She neglected to make the monthly payments as they became due, and for months previous to the institution of the present suit, she refused to make any payments whatever. And the rule is general, that the right to rescind a contract rests only with the party who is without default. One party cannot, as is well observed by counsel, violate the contract himself, and then seek a rescission on the ground that the other party has followed his example. (Chitty on Cont. 636.)

In the second place, the contract has been in part performed, and the parties cannot be restored to their original position. The right of rescission cannot exist under such circumstances. How could Estill and McCauley, after being in possession for nearly three years, and performing valuable services, be placed in their previous condition? A contract, says Parsons in his valuable work, cannot be rescinded " if the failure of the other party be but partial, leaving a distinct part as a subsisting and executed consideration, and leaving also to the other party his action for damages for the part not performed. Generally, no contract can be rescinded by one of the parties, unless both can be restored to the condition in which they were before the contract was made. If, therefore, one of the parties has derived any advantage from a partial performance, he cannot hold this and consider the contract as rescinded because of the non-performance of the residue, but must do all that the contract obliges him to do, and seek his remedy in damages." (2 vol. 191; Story on Cont. sec. 844, *a; Hunt* v. *Silk,* 5 East. 449; *Mason* v. *Bovet,* 1 Denio, 69, 74; *Reed* v. *Blandford,* 2 Young & J. 278; *Turnpike Company* v. *Commonwealth,* 2 Watts, 433.)

In the third place, the State does not offer to make restitution of the property received, or pay the value of the claims relinquished at the execution of the contract, or to pay what she shows in the complaint remains due thereon. Such restitution and payment must precede the right of the State to ask for a rescission. The rule is universal and inflexible, and rests upon natural justice. He who seeks equity must do equity.

As indemnity against breaches of the contract, the law of 1856 required the execution of a bond in the penal sum of two hundred thousand dollars, and the contract expressly provides that new and additional bonds may be required of the lessee, whenever the Commissioners may deem those taken insufficient. It is too late to complain that other security was not exacted by stipulations, or the reservation of a

right to reënter and resume the possession of the premises, and the control of the prisoners, whenever the State should deem such proceeding proper.

Some of the breaches alleged—such as the neglect of the lessee to furnish suitable and proper food, clothing and medical attendance for the convicts, or sufficient overseers, guards and employees for the prison, are urged with ill grace by the State, who has made to the lessee and his assignee the payments stipulated, for a part of the time, only in depreciated paper, and for a part of the time has withheld such payments entirely—thus depriving them, either partially or wholly, of the means to which they had a right to look to provide such food, clothing, attendance, guards and employees.　Indeed, the legislation disclosed in the pleadings, and to which we have referred in this opinion, has tended to greatly embarrass the lessee and his assignee in the management of the affairs of the prison, and in the discharge of the obligations of the contract.

When the State has complied, in good faith, with her own engagements, it will be time to consider whether she can invoke the interposition of a Court of Equity to cancel her contract for breaches of its stipulations by the lessee, or those who represent him.

Judgment affirmed.

BALDWIN, J., having been counsel for Respondents in the Court below, did not sit in the case.