THE PEOPLE *ex rel.* THE ATTORNEY GENERAL *v.* J. NEELY
JOHNSON *et al.*

Article VIII of the Constitution expressly prohibits the Legislature from creating a debt
in any way which shall, in the aggregate with previous debts and liabilities of the
State, exceed the sum of three hundred thousand dollars, except for the purposes or
in the manner pointed out in the Article.

This is too plain to permit the Courts to resort to rules of construction to alter such
meaning.

It follows that the Act of April 8th, 1855, providing for the construction of a wagon
road to the Sierra Nevada mountains, and authorizing the Board of Commissioners to
contract for the same at a price not exceeding three hundred thousand dollars, passed
while the aggregate existing indebtedness of the State, without counting that incurred
by the first Legislature, exceeded three hundred thousand dollars, and containing no
provision for the submission of the question to the people, was unconstitutional and
void.

The Legislature can adopt the present indebtedness of the State, and may go further,
and by making appropriations for future necessary expenses, submit the same to the
people for ratification.

APPEAL from the District Court of the Sixth Judicial District.

This was a bill in equity filed in the Court below by the Attorney
General, against J. Neely Johnson, Governor of the State of California,
John A. Brewster, Surveyor General, and David F. Douglass, Secretary
of State, a board of commissioners by virtue of an Act of the Legisla-
ture, entitled "An Act to provide for the survey and construction of a
wagon road to the Sierra Nevada mountains," to enjoin said commis-
sioners from entering into any contract for the construction of said road,
for the reason that said Act is unconstitutional and void.

The bill shows that said commissioners were authorized to contract
for the construction of the road at a price not exceeding the sum of
$100,000, and that at the time of the passage of the said Act, the State
of California was indebted in the sum exceeding $300,000; that the
aggregate indebtedness of the State over and above the sum sought to
be appropriated, exceeded the sum of one million of dollars, and that
said Act contained no provision submitting said appropriation to the
people; neither had the previous indebtedness been submitted to and
ratified by a vote of the people, as required by the Constitution of the
State.

The defendants demurred. In the Court below the demurrer was
overruled, and the case is submitted to this Court, by stipulation, on the
complaint and demurrer, and the judgment of the Court below.

*Wm. T. Wallace, Attorney General,* for the People.

*McCallum, Robinson & Long,* contra.

No briefs on file.

Mr. Chief Justice Murray, after stating the case, delivered the opinion of the Court. Mr. Justice Heydenfeldt and Mr. Justice Terry concurred.

The facts of the case are agreed on, so that the single point presented for our consideration, is whether the Act of the 8th of April, 1855, is in contravention of Article VIII of the Constitution, or not. The language of the Article is as follows: "The Legislature shall not in any manner create any debt or debts, liability or liabilities, which shall singly, or in the aggregate, with any previous debts or liabilities, exceed the sum of three hundred thousand dollars, except in case of war, to repel invasion, or suppress insurrection, unless the same shall be authorized by some law for some single object or work, to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest of such debt or liability, as it falls due, and also pay and discharge the principal of such debt or liability within twenty years from the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged; but no such law shall take effect, until at a general election it shall have been submitted to the people, and have received a majority of all the votes cast for and against it at such election; and all money raised by authority of such law, shall be applied only to the specific object therein stated, or to the payment of the debt thereby created; and such law shall be published in at least one newspaper in each judicial district, if one be published therein, throughout the State, for three months next preceding the election at which it is submitted to the people."

It is somewhat singular that this question, involving as it does such vital interests to the people of this State, has never been raised in this Court before. It has been made the subject of legislative discussions and executive messages; but there seems to have been a general disposition on the part of all to give it the go-by, and the power of the Legislature to contract a debt of more than three hundred thousand dollars, except in the manner provided in the Constitution, has never before within our knowledge, been questioned in any Court of justice.

Whether considerations of public policy have actuated the other departments of the State Government, in avoiding a judicial exposition of this Article of the Constitution, or private interests have excluded any question on the subject, we are, of course, unprepared to say; but the question having been fairly made and presented for our determination, we are ready to pass upon it without hesitation.

The language of the article already quoted, is too clear and explicit to admit of but one interpretation. In fact, it would defy the ingenuity of the most subtle intellect to invent a consistent interpretation, other than that which naturally suggests itself from the words of the Article. It is without ambiguity, and expressly forbids the Legislature from creating a debt of more than three hundred thousand dollars, in any way, unless the same is left to the vote of the people. So plain is the meaning of the language, that it is scarcely worth while to invoke

rules of construction, and in cases where the language of an Act is plain and unambiguous, Courts are not permitted to resort to rules of construction to alter such meaning; but if it were otherwise, the doubt could be easily resolved by a reference to the intention of the framers of the Constitution, as appears in the reports of the Debates of the Convention, p. 165.

To show what was understood by the members of that body, I think it proper to transcribe what was said on the subject, while the same was under advisement by them, which is as follows : " Article VIII of the report of the committee then coming up, Mr. Sherwood moved to strike out the word ' one ' before the words ' hundred thousand dollars,' and insert the word ' five.' " " By this section," said Mr. Sherwood, " we prevent the Legislature from creating a debt of over one hundred thousand dollars in the aggregate, without submitting it to a vote of the people.    He was in favor of submitting the question of creating a large debt to the people ; but it may be necessary in carrying on the expenses of the Government, to borrow temporarily more than that sum.    In the State of New York, there is a provision of a similar nature in the Constitution, but the amount is one million, instead of a hundred thousand. In his opinion, it might be necessary at some period, (probably at the very first session of the Legislature, before a tax can be levied and collected, in order to keep the wheels of Government in motion,) to borrow more than a hundred thousand dollars as a temporary loan.    He would make it five hundred thousand.    The expenses of this State would be larger than those of any other State, and this sum might be required.

" Mr. Norton said, that the committee were not particular in regard to the sum, but they thought it necessary to specify some definite amount.    He thought himself, that the circumstances of the country required that the sum should be increased, so that the Legislature should have the power to raise such an amount as might be indispensably necessary.

" Mr. Sherwood stated further, that it was, in the view of the committee, deemed proper to reconsider this question, and fix the amount at a larger sum than that reported, but from some circumstance or other it was not reconsidered.

" Mr. Gwin was utterly opposed to the amendment to increase the amount of State debt to five hundred thousand dollars.    If we could not carry on our State Government without contracting a debt of that magnitude, we were certainly starting wrong.    This was a provision of the utmost importance.    He hoped the report of the committee would be received, or if the amount was to be increased, that it would be in a very small ratio.    He was opposed to the principle of permitting the Government to create a public debt at all, and would not go beyond the report of the committee.

" Mr. McCarver was of opinion that one hundred thousand dollars were sufficient to pay the expenses of State Government.    Iowa went into existence prohibiting the borrowing of over one hundred thousand

dollars, and he did not see why we should not do so.   Nearly all the lands of Iowa were public lands, and were not taxable by the State. He was of opinion that the sum should not, at all events, be over three hundred thousand dollars.   If we went beyond that, we created an indebtedness that might probably be entailed upon our posterity; and he was altogether opposed to the principle of borrowing money, and making others pay for it.   The interest in a short time would amount to as much as the principal.   It was impossible to borrow money here, short of six to ten per cent.   He believed that two, or at furthest, three hundred thousand dollars, *would be* sufficient.   He would be willing to vote for that, but not one cent beyond it.

" Mr. Hastings observed, that the gentleman seemed to labor under the impression that if the sum of $500,000 was inserted, instead of $100,000, a debt to that extent must necessarily be created.   He conceived it was discretionary with the Legislature, and that probably no debt at all would be created.   If it was necessary to provide for obtaining money when required, it was highly important that we should so form our Constitution that the Legislature might be able to meet the contingency.   He would be willing to rely upon the good judgment of the Legislature.   It could not reasonably be presumed that the Legislature would create a debt to the full amount of the authority given it, unless the public necessities demanded it.

" Mr. Sherwood said that it would not probably be necessary to borrow money at all, after the first organization of the Government.   It would be necessary to raise some fund to put the wheels of Government in motion, and to do that, would certainly require over a hundred thousand dollars.

" The question being on Mr. Sherwood's amendment, to insert ' five hundred thousand,' it was rejected.

" Mr. Lippitt moved to insert 'three' instead of ' one.'   The question being on this motion, it was adopted.

" Mr. Hill moved to amend the latter part of the section, so as to read, ' and such law shall be published in at least one newspaper in each judicial district, if one is published therein, throughout the State, for three months next preceding the election at which it is to be submitted to the people,' which was agreed to, and Article VIII, as amended, was then adopted."

It has been contended, that the true intention was to prevent the Legislature from borrowing money, or making appropriations for other purposes than those strictly governmental; and it is urged, that if such be not the true interpretation of the article, then, whenever the State indebtedness exceeds the sum specified, the wheels of Government must stop for want of necessary funds to keep it in operation.   This conclusion by no means follows.   The debates plainly evidence the fact, that the Convention thought the revenue of the State would be equal to its expenditures; but as some doubts existed upon this point, it was proposed to allow a margin of three hundred thousand dollars over and above the revenue; if this should prove to be insufficient, then the con-

People *v.* Johnson.

stitutional limit having been exhausted, the power of taxation and appropriation returned to the people, who might determine, through the medium of an election, for or against appropriations.

This feature of our Constitution was admirably designed to check the improvident expenditure of money, and the accumulation of taxes.    The people refused to part with the exclusive right, and therefore restricted the authority of the Legislature within certain bounds, reserving to themselves the power of determining beyond such limits.

That the Article was not intended simply as a limitation on the power to borrow money, is evident from its language; the words are, "*shall not in any manner create any debt or debts, liability or liabilities,* which singly, or in the aggregate," etc., etc.    A debt or liability may be created, in other ways than by the borrowing of money; it may be created by appropriation, where there is no money to meet it; it may be created by drawing on a fund where there is no cash in the treasury, or incoming revenue, to satisfy such drafts; it may be done in various ways : yet the stern letter of the Constitution imperatively forbids the Legislature from creating, *in any manner,* except in the mode pointed out, such debts or liabilities.

The framers of our State Constitution were mostly men fresh in the experience of the errors into which other States had fallen.    They had witnessed the unhappy results that followed extravagant legislation, and were anxious to rear a bulwark here, which would protect us against similar disasters.    They were thoroughly acquainted with the history of the gigantic schemes of internal improvements entered into by the South and West; of the establishment of banks; of the expansion of their circulating medium; of the inflation of every thing; of the general demoralization, which resulted from an uncontrolled power of legislation; and, in fact, of the weakness of human nature itself.    They had witnessed ruin like an avalanche overwhelm them, destroying visionary hopes of wealth and greatness, and leaving them to sink beneath the crushing weight of debt and taxation, or driving them to the more dishonorable alternative of repudiation.    They were aware that years would scarcely repair the follies of a single day, and that the high rate of taxes, imposed in many of the States, to pay the interest on the debts so improvidently contracted, had the effect to drive capital and population from their shores.

With these examples before them, in a country whose very atmosphere was heavy with gold, and knowing, that by the immutable laws of trade, the necessary consequences of a plethoric circulating medium would be the inflation of the price of everything, carrying in its train as attendant evils, speculation and improvidence, can it be wondered that the framers of our Constitution should have attempted to prevent the evil consequences which they foresaw, by constitutional checks and barriers?    No one can doubt their intention, and it is only to be regretted that that which was so wisely begun, has been so rashly departed from.

Had a different course been pursued, then we might have proudly

boasted, not only of our soil, climate, and mineral resources, but of that legislative wisdom which appreciated these rare advantages, and protected them for the inhabitants of our favored State. Instead of the prospect that everywhere meets the eye, of business stagnation, distrust, debt, taxation, and a high rate of interest, we might have been justly proud of our credit and character, and challenged the confederacy to show a State where labor was so highly remunerated, or property so lightly taxed for the purposes of government.

If any doubts existed as to the constitutionality of the present State indebtedness, or the construction which we have adopted, that doubt might be easily resolved by a reference to the 16th section of the 12th Article of the Constitution, which, for the purpose of putting into operation the machinery of the government, provides that the limitation on the powers of the Legislature contained in the 8th Article, shall not extend to the first Legislature, which was authorized to negotiate for any amount in its discretion.

It is urged, that the principle in this case has been substantially decided in the case of Washington v. Page, 4 Cal. R., 388, in which this Court held that the 25th section of the 4th Article of the Constitution, which provides that, "every law enacted by the Legislature, shall embrace but one object, which shall be expressed in its title," was directory, and did not nullify laws passed in violation of it.

On an examination of that case, it will be observed that this Court exercised one of the most dangerous powers ever committed to the hands of any tribunal, and one for which there are but few precedents. If a Court were at liberty to say at pleasure, that the organic law of the State was directory, then the whole Constitution could be frittered away by judicial decisions, involving in its abrogation the social and political rights of the citizen. Such a power is too dangerous ever to be committed to the arbitrary will of any man or set of men, and on examination of that case it will be found that the Court was not actuated alone by imperative motives of public policy, but was also influenced by the analogies of the rule in other States, and the cotemporaneous construction adopted by the Legislature of this State.

In the present case, there are no considerations, based upon settled rules, presented to us. The whole argument rests upon what is supposed to be reasons of public policy, and the inconvenience which will result to a few scrip and bond holders, who have come into possession of these evidences of indebtedness with the full knowledge of their worthlessness.

If we were at liberty to decide this case on grounds of public policy, we could not hesitate one moment between bankruptcy and ruin, or credit and prosperity. It is time that the axe should be laid at the root of this political evil; that this system of extravagance, which has been the curse of the State for the last five years, exhausting the substance of the people, destroying our credit abroad, and corrupting and demoralizing our citizens at home, should be stopped; and that honesty,

prudence and economy should preside over the legislation of the State, and the administration of her financial affairs.

With a population not exceeding 400,000 people, we have incurred a debt, as appears by the report of the State Comptroller for the year 1855, of $3,040,458 96. If such things are to be continued, what will be the condition of the country ten years hence? The entire taxable property, real and personal, of the State for the year 1855, was assessed at $103,879,193 55, the revenue for the same year was $1,155,537 10, while the expenditures amounted to $1,337,496 64, making an excess of $181,959 54, being $132,738 68 more than the expenses of the previous year.

When it is borne in mind that the sum of $212,833 56, was received from the sale of lands in the city of San Francisco, the fact will be shown that outside of this source of revenue which is exhausted, the expense of the State during the year 1855, over and above the legitimate revenue, amounted to the sum of $394,793 20. If we had the time, we might institute a comparison between the State of New York, with a taxable property of twelve or thirteen times that of California, and a population of over three millions and a half, or the States of Pennsylvania, Ohio or Indiana, and show, that aside from the interest upon their State debt, for which they have their internal improvements, the actual cost of the administration of those governments, does not greatly exceed that of this State, and that the difference is small when compared with the wealth and population.

In the cities of San Francisco and Sacramento, the taxes, State, county and city, to say nothing of license taxes and other municipal imposts, amount to some five per cent.—more than equal to the customary rate of interest on the Continent of Europe—all of which is finally paid by the consumers of the merchandise and commodities which incur these charges in passing through said cities.

To withstand these exactions, the people of this State would require more than Promethian vitals.

We refrain, however, from further comment upon the financial condition of the country. It is a subject which more properly belongs to the other branches of the government. We were led into the digression on account of the arguments of public policy which have been urged upon us, and we have only to remark, in addition to what has been already said, that, if the government cannot be carried on upon the revenue collected, the whole system is so radically defective, that nothing but a thorough reformation can reach it.

Before closing, it may not be improper to intimate our opinion with regard to the manner in which the present indebtedness of the State can be legalized, as we cannot entertain a doubt that the people of this State will act in good faith in this behalf, and that they are as jealous of her honor as they would be of their own.

We have no fears that those who have adopted California as their future home, who have laid broad the foundation of an empire on the Pacific coast, will ever permit her faith to be questioned, or her name

to be branded with repudiation. We have an abiding faith in the integrity and justice of the people, and believe that while they will readily assent to any measure to secure the payment of our present indebtedness, they will take heed how they incur such obligations in the future.

If we are warranted in this opinion, the Legislature can, at its next session, adopt the present indebtedness of the State, and may go further, and by making appropriations for the future necessary expenses of the government, over and above the revenues, submit the same in conformity with the 8th Article of the Constitution to the people for ratification.

In conclusion, we would add, that we do not wish to be understood as reflecting, in any manner, upon either of the other departments of the government. Human nature is fallible, and we do not arrogate to ourselves any superiority of judgment, but have, in the discharge of our duty, thought proper to refer to what had been done by past Legislatures, that we might better judge of what might be done in the future.

In announcing this opinion we are aware that we will meet with the opposition of those whom self interest ever prejudice; but if it shall have the effect of lopping off the unseemly excrescences which cluster so thick around the administration of the government, or of correcting any of the evils which we have shadowed forth, we will rest contented; well satisfied that time and a sober judgment will, sooner or later, justify both the necessity and correctness of this opinion.

From the foregoing it follows, that the Act of April 8, 1855, is unconstitutional and void.

Judgment affirmed.