[S. F. No. 10240. In Bank.—June 13, 1922.]

VETERANS' WELFARE BOARD et al., Petitioners, v. FRANK C. JORDAN, as Secretary of the State of California, Respondent.

[1] VETERANS' WELFARE BOND ACT—CREATION OF BONDED INDEBTEDNESS—CONSTITUTIONAL LAW.—The Veterans' Welfare Bond Act (Stats. 1921, p. 959), authorizing a bond issue to carry out the provisions of the Veterans' Welfare Act (Stats. 1921, p. 969) and the Veterans' Farm and Home Purchasing Act (Stats. 1921, p. 815), provides for the creation of an indebtedness against the state within the meaning of section 1 of article XVI of the constitution, notwithstanding it makes an appropriation for the payment of the issued bonds and interest.

[2] CONSTITUTIONAL LAW—GIVING OR LOANING OF THE CREDIT OF THE STATE.—Section 31 of article IV of the constitution, prohibiting the giving or loaning of the credit of the state, should be construed liberally to effect its purpose, and such construction prohibits any plan or scheme by which in substance and effect the credit of the state is given or loaned, regardless of the particular form which the transaction takes.

[3] VETERANS' WELFARE BOND ACT—PURCHASE OF LAND AND SALE TO VETERANS ON CREDIT—CONSTITUTIONAL LAW.—The Veterans' Welfare Bond Act in so far as it provides for the devotion of a portion of the money raised by the bond issue to carry out the provisions of the Veterans' Farm and Home Purchasing Act

---

1. Constitutionality of statutes providing for bounty or pension for soldiers, notes, Ann. Cas. 1913B, 951; Ann. Cas. 1915C, 282; 7 A. L. R. 1636; 13 A. L. R. 587; 15 A. L. R. 1344.

2. Constitutionality of statute authorizing state to loan money to engage in business of a private nature, note, 14 A. L. R. 1151.

3. Validity of statute providing for governmental assistance of ndividual members of certain classes, note, 7 L. R. A. (N. S.) 1196.

providing for the purchase by the state of land to be sold to the veterans on credit is violative of section 31 of article IV of the constitution as a loan of the credit of the state.

[4] STATUTORY CONSTRUCTION—PUBLIC PURPOSE—ACT WITHIN POWER OF LEGISLATURE—CREDIT OF STATE AS INCIDENT—EFFECT OF.— Where a separate and distinct public purpose is achieved and such public purpose is one within the constitutional powers of the legislature to bring about, the law will not be declared unconstitutional because of the fact that as an incident to its main purpose the credit of the state is used to effectuate that purpose.

[5] ID.—CONSTITUTIONALITY OF STATUTE.—Doubts are to be resolved in favor of the constitutionality of a statute.

[6] CONSTITUTIONAL LAW—TAKING OF PROPERTY WITHOUT DUE PROCESS.—The broad general restrictions against the taking of property without due process of law ought not to be construed so as to prevent legislative action adjusted to the growing needs and the changed condition of the people.

[7] VETERANS' WELFARE BOND ACT—SALE OF LAND TO VETERANS AT COST—CONSTITUTIONAL LAW.—The provisions of the Veterans' Welfare Bond Act authorizing a bond issue for the purpose of acquiring, subdividing, improving, acquiring water rights for, and selling the land so improved to veterans at cost, are valid as authorizing the expenditure of public money for a public purpose.

[8] ID.—PERSONAL PROPERTY FOR FARMING OPERATIONS—LOAN OF PROCEEDS OF BONDS—CONSTITUTIONAL LAW.—The portions of the Veterans' Welfare Bond Act providing for the loaning of money from the proceeds of the bonds to settlers to enable them to purchase personal property to carry on their farming operations is a loan of the credit of the state.

[9] ID.—UNCONSTITUTIONALITY OF PORTION OF ACT—EFFECT OF.—The unconstitutionality of the Veterans' Welfare Bond Act so far as it authorizes the use of money from the sale of bonds in the farm and home purchasing scheme does not affect the validity of the bond issue so far as it authorizes the welfare board to use the money derived from the sale of bonds in the purchasing, improving, subdividing, and disposition of such land so subdivided.

[10] ID.—BOND ISSUE—"SINGLE OBJECT"—CONSTITUTIONAL LAW.—The bond issue provided by the Veterans' Welfare Bond Act is for a single purpose within the meaning of section 1 of article XVI of the constitution, providing that the legislature shall not create a debt unless the same shall be authorized by law for some single object or work to be distinctly specified therein, and of section 34 of article IV, providing that no bill making an appropriation, except the general appropriation bill, shall contain more than one item of appropriation, and that for a single and certain purpose, to be therein expressed.

[11] ID.—WAYS AND MEANS FOR REPAYMENT OF LOAN—CONSTITU-
TIONAL LAW.—The Veterans' Welfare Bond Act is not unconstitu-
tional, for the reason that it does not provide ways and means for
the repayment of the loan as required by section 1 of article XVI
of the constitution, since section 5 of the act provides in general
terms that the bonds shall be paid from a fund to be raised in
part by taxation in the same manner as moneys raised for the
general purposes of the state.

APPLICATION for a Writ of Mandate to compel the
publication of the Veterans' Welfare Bond Act. Granted.

The facts are stated in the opinion of the court.

John U. Calkins, Jr., Milton D. Sapiro, George J. Hat-
field, R. W. Kearney and Frederick B. Wood for Petitioners.

Gregory & Goodell for Respondent.

WILBUR, J.—The petitioner, Veterans' Welfare Board,
prays for a writ of *mandamus* to compel the respondent to
publish an act of the legislature known as the Veterans'
Welfare Bond Act of 1921 (Stats. 1921, p. 959), as required
by section 17 of that act (Stats. 1921, pp. 959, 966), as
notice to the voters who are to vote on said bond issue. The
respondent has refused to publish this statute on the ground
that the same is unconstitutional and void. The act is en-
titled: "An Act to *authorize the creation of a debt or debts,
liability or liabilities,* through the issuance and sale of state
bonds, for the single object of creating a fund to carry on
the operations of the veteran's welfare board . . . to pro-
vide ways and means, exclusive of loans, for the payment
of interest of such debt or debts, liability or liabilities, as
such interest falls due, and also for the payment and dis-
charge of the principal of such debt or debts, liability or
liabilities, as such principal matures. . . . " (Italics ours.)

Section 1 of the act provides: "For the purpose of creat-
ing a fund to carry on the operations of the Veterans' Wel-
fare Board . . . the veterans' welfare finance committee
created by this act shall be and it hereby is authorized and
*empowered to create a debt or debts, liability or liabilities,
of the State of California,* in the manner and to the extent
hereinafter provided, but not otherwise, nor in excess
thereof." (Italics ours.)

Section 2 of the act provides for the issuance and sale of state bonds of the denomination of $1,000 each and not exceeding in the aggregate $10,000,000, if authorized by a majority of the voters of the state. Provision is made for the submission to the people of the act in question by printing on the ballot "For the veterans' welfare bond act of 1921" and "Against the veterans' welfare bond act of 1921," with this explanation: "This act provides for a bond issue of ten million dollars to be used by the veterans' welfare board in assisting California war veterans to acquire farms or homes."

It is contended by respondent that the act in question violates article IV, section 31, of the constitution, in that it authorizes the gift or loan of the credit of the state. The money raised by the issuance of bonds under the statute is to be used to carry out the provisions of the Veterans' Welfare Act (Stats. 1921, p. 969) and the Veterans' Farm and Home Purchasing Act (Stats. 1921, p. 815), the provisions of which were recently before this court in the case of *Veterans' Welfare Board* v. *Riley*, 188 Cal. 607 [206 Pac. 631]. In our opinion we cited with approval the decision of the New York court of appeals in *People* v. *Westchester County Nat. Bank*, 231 N. Y. 465 [15 A. L. R. 1344, 132 N. E. 241], with relation to the proposed bond issue in that state of $45,000,000 for the payment of a bonus to the World War veterans of that state. That court held that by the issuance of state bonds and the payment of the money derived from a sale thereof as a bonus to the veterans, there was a giving of the credit of the state to such individuals as received money from the proceeds of the sale of bonds in violation of the constitutional provisions of the constitution of that state prohibiting the giving of the credit of the state to individuals. We pointed out in our decision that article IV, section 31, of our constitution, was not violated by the terms of the two acts under consideration because the effect of the act was to loan the money, and not the credit of the state, while article IV, section 31, prohibited the giving or loaning of the credit of the state and did not prohibit the loaning of the money of the state. It was clearly intimated in that decision that where the state was required to obtain the money so loaned by a bond issue, and the proceeds of the bonds were used for the purpose of purchasing land to

be sold on credit, it was, in effect, loaning the credit of the state to the purchaser of the land from the state.

The petitioners meet this difficulty by a very ingenious argument based upon the case of *People* v. *Pacheco*, 27 Cal. 175. It is argued that inasmuch as the Veterans' Bond Act of 1921 makes an appropriation in subdivision 5 for the payment of the issued bonds and interest that no debt whatever is created by the issuance of the bonds. This argument would lead to the conclusion that an indebtedness, if authorized according to section 1, article XVI, of the constitution created no indebtedness, for that article, under the head of "State Indebtedness," provides that the legislature "shall not, in any manner, *create any debt or debts, liability or liabilities, . . .* unless the same shall be authorized by law . . . *which law shall provide ways and means,* exclusive of loans, *for the payment of the interest of such debt or liability as it falls due, and also to pay and discharge the principal of such debt or liability* within seventy-five years of the time of the contracting thereof, and shall be irrepealable until the principal and interest thereon shall be paid and discharged and such law may make provision for a sinking fund to pay the principal of such debt or liability to commence at a time after the incurring of such debt or liability of not more than a period of one-fourth of the time of maturity of such debt or liability . . . and all moneys raised by authority of such law shall be *applied only to the specific object therein stated or to the payment of the debt thereby* created. . . . The Legislature may, at any time after the approval of such law by the people, *if no debt shall have been contracted in pursuance thereof,* repeal the same." (Italics ours.)

Under this constitutional provision such law creating an indebtedness must not only be ratified by a vote of the people but must also make provision for repayment of the indebtedness. If it is true that no debt against the state is created within the meaning of the constitution where ways and means are provided at the time of the creation of the debt for its payment, this section of the constitution, in effect, would read: The legislature shall not create any debt, where such indebtedness is in excess of $300,000, except by a law which does not create a debt and except where the people have approved such indebtedness. It is certainly a

startling proposition that the issuance of $10,000,000 in interest-bearing bonds by the state does not create an indebtedness. It is obvious that the legislature did not take this view of the situation or it would not have made provision for the submission of the bond issue to the people and would not have provided in the title of the act, and in the first subdivision thereof, for the creation of an indebtedness. It must be conceded, however, that the decision in *People* v. *Pacheco, supra,* relied upon by the petitioners, tends to support their contention that where the legislature by statute authorizes the indebtedness, and provides and appropriates the revenue for payment of such indebtedness as it accrues, such statute does not create a debt within the meaning of article IV, section 31, and article XII, section 13, and article XVI, section 1, of the constitution. The legislature of California, on April 4, 1864 (Stats. 1864, p. 344), passed a law authorizing the Central Pacific Railroad Company of California to issue bonds in the sum of $1,000 each, not exceeding $12,000,000 in all, bearing interest at a rate not exceeding seven per cent per annum and provided that the interest coupons of the first million and a half dollars of such bonds should be payable at the state treasury. It provided for the annual levy and collection of a tax of eight cents on each $100 of taxable property in the state to be paid into a fund from which said interest coupons should be paid as they fell due and appropriated such money in such fund for the payment of said interest coupons. It was claimed that this law violated article VIII of the constitution of 1849, which is substantially identical with the provisions of article XVI, section 1, of the present constitution. The constitution of 1849, article XI, section 10, is also substantially identical with the provision of article XII, section 13 of the present constitution. "The credit of the state shall not, in any manner, be given or loaned to or in aid of any individual, association, or corporation; nor shall the state, directly or indirectly, become a stockholder in any association or corporation." It was held in *People* v. *Pacheco, supra,* that the credit of the state was not loaned to the Central Pacific Railroad Company for the reason that the legislature in the act authorizing the aid to the railroad company also made an appropriation to pay said interest coupons from taxes already levied. The court in that case

after quoting extensively from *State* v. *Medbery,* 7 Ohio St. 522, advanced the following proposition: "The theory is, that if the legislature provides a million of dollars revenue, by taxation or otherwise, for any given years, or other period of time within the constitutional limit, and appropriates a million of dollars to be paid out of it, the one balances the other, and the debt or liability of the state is not barred thereby. . . .

"In our Constitution, as we have seen, there is no restriction upon the power of taxation, or upon the objects, or the time for which appropriations may be made, except, that 'no appropriation for a standing army shall be for a longer time than two years.' As to all other objects, so far as any constitutional restriction is concerned, it may as well be for twenty years as for two years. . . .

"It follows, from these views, that the act under consideration does not create, or authorize to be created, a debt, or liability, within the meaning of the limiting clause of the eighth article of the Constitution. . . . "

The reasoning of this opinion would lead to the conclusion that where the legislature by an act creating an obligation or indebtedness also levied a tax to pay the indebtedness and appropriated the proceeds of the tax levy to the payment of such indebtedness, that the appropriation balanced the indebtedness and that there was therefore no debt created by the act within the meaning of the clause limiting the power of the state legislature to create indebtedness, and as was held in that case, as there was no debt there was no loan of credit to the corporation. This reasoning would perhaps justify the conclusion in this case that the bond issue did not create a debt within the meaning of the section authorizing the creation of an indebtedness and therefore that there was no loaning of credit contemplated by the law within the meaning of article IV, section 31, of the constitution. There are, however, several points of differences between the situation presented here and that presented in the case of *People* v. *Pacheco, supra.* In that case there were no bonds issued by the state, and no proposal to submit the issuance of bonds to the voters of the state. The legislature provided for an appropriation to pay the interest coupons upon the bonds of a private corporation secured by a mortgage upon its property. The interest ac-

crued annually and was to be met annually by an annual tax levy in an amount fixed by the statute, authorizing the payment of the interest coupons. The court in *People* v. *Pacheco, supra,* cited *State* v. *McCauley,* 15 Cal. 455, *Mc-Cauley* v. *Brooks,* 16 Cal. 11, 24, and *Koppikus* v. *State Capitol Commrs.,* 16 Cal. 248, as controlling authority for the proposition advanced, the court stating:

"The questions to be determined, are:

"Firstly—Does the *appropriation* made by the act for the payment by the state semi-annually during the next twenty years of the interest on the first fifteen hundred bonds create a debt, or liability, within the meaning of these terms, as used in Article VIII of the Constitution. . . .

"The first question appears to us to have been determined in the negative by our predecessors in the cases of the *State of California* v. *McCauley,* 15 Cal. 455, *McCauley* v. *Brooks,* 16 Cal. 24, and *Koppikus* v. *State Capitol Commissioners,* 16 Cal. 249. . . .

"But if the reasons for maintaining the decisions already cited upon this question were less cogent than they are, we should now hesitate long before overruling them. The last of them was rendered in 1860. The construction put upon the clause under consideration thenceforth became a judicially recognized part of the Constitution. Since that time two legislatures have proposed, and the people have adopted, numerous amendments to other sections of the Constitution, but this provision was left unchanged. It must be presumed, therefore, that they were satisfied to have the provision under consideration stand with the interpretation thus put upon it by the courts." (220, 221.) (Italics ours.)

In considering the effect of these decisions upon the proper interpretation of the constitution of 1879 other decisions of the supreme court under that constitution must also be considered. In the case of *People* v. *Johnson,* 6 Cal. 499, an act to provide for the survey and construction of a wagon road through the Sierra Nevada Mountains at a price not exceeding $300,000 was held invalid because at the time the act was passed there was an aggregate indebtedness of the state over and above the sum sought to be appropriated of a million dollars and the indebtedness thereby created had not been submitted to the voters of the

state. In commenting upon the provisions of article VIII of the constitution of 1849 the court stated:

"The language of the article already quoted, is too clear and explicit to admit of but one interpretation. In fact, it would defy the ingenuity of the most subtle intellect to invent a consistent interpretation, other than that which naturally suggests itself from the words of the Article. It is without ambiguity, and expressly forbids the Legislature from creating a debt of more than three hundred thousand dollars, in any way, unless the same is left to the vote of the people. So plain is the meaning of the language, that it is scarcely worth while to invoke rules of construction, and in cases where the language of an Act is plain and unambiguous, courts are not permitted to resort to rules of construction to alter such meaning; but if it were otherwise, the doubt could be easily resolved by a reference to the intention of the framers of the Constitution, as appears in the reports of the Debates of the Convention, p. 165 (pp. 499–501).

"That the Article was not intended simply as a limitation on the power to borrow money, is evident from its language; the words, are, '*shall not in any manner create any debt or debts, liability or liabilities,* which singly, or in the aggregate,' etc., etc. A debt or liability may be created, in other ways than by the borrowing of money; it may be created by appropriation, where there is no money to meet it; it may be created by drawing on a fund where there is no cash in the treasury, or incoming revenue, to satisfy such drafts; it may be done in various ways; yet the stern letter of the Constitution imperatively forbids the Legislature from creating, in any manner, except in the mode pointed out, such debts or liabilities. . . . " (503)

Article VIII of the constitution was again considered in *Nougues* v. *Douglass,* 7 Cal. 65, where the act of April 18, 1856 (Stats. 1856, p. 110), providing for the erection of a state capitol at a cost not to exceed $300,000, to be paid for by bonds of the state, was held to be unconstitutional, although the act, section 16, provided for the payment of said bonds, principal and interest, from funds derived from the sales or leases of lands donated to the state of California by the United States government for the purpose of erecting public buildings and authorizing the state treasurer to

set aside money in the general fund to pay any additional amount necessary to pay said bonds as they accrued. Another act passed by the legislature in 1856 (Stats. 1856, p. 48), providing for the leasing of the state prison grounds and property together with the convict labor of the state for a period of five years at a price not to exceed $15,000 per month, was held constitutional in *State* v. *McCauley,* 15 Cal. 429. The law was attacked on the ground that it in effect created a debt of $600,000, the board of prison directors having contracted at the rate of $10,000 a month for five years. The court said:

"The contract provides for the payment of $10,000 a month, and the act appropriates this sum per month. The appropriations are to take effect, and the services are to be rendered in future. Until the services are rendered, there can be no debt on the part of the state. The lessee could not have claimed, at any time after the making of the contract, the aggregate of all the monthly installments—because the state never owed him that amount. The state only became indebted as the services were each month performed."

This holding, it will be observed, is in line with the subsequent cases of this court in regard to municipal indebtedness (*McBean* v. *Fresno,* 112 Cal. 159 [53 Am. St. Rep. 191, 31 L. R. A. 794, 44 Pac. 358]; *Higgins* v. *San Diego,* 118 Cal. 524 [45 Pac. 824, 50 Pac. 670]). This view was adhered to in the case of *McCauley* v. *Brooks,* 16 Cal. 11. In the case of *Koppikus* v. *State Capitol Commrs.,* 16 Cal. 249, an act providing for the construction of a state capitol in the city of Sacramento (Stats. 1860, p. 128) was held not to violate article VIII of the constitution of 1849, limiting the indebtedness of the state to $300,000, notwithstanding the fact that it authorized the construction of a capitol valued at $500,000, for the reason that the commissioners were only authorized to contract to the extent of $100,000 and the act appropriated $100,000 out of money in the treasury not otherwise appropriated to carry the act into effect. The court in that regard stated as follows: "The commissioners are only authorized to contract to the extent of $100,000; though a plan be adopted by them which may require, in its execution, the half million designated. For the liabilities which may be thus incurred, the act makes

provision; it appropriates, for that purpose, the requisite sum, thus anticipating their existence, and discharging them as they arise. (See *State* v. *McCauley and Tevis,* 15 Cal. 429.) Before any greater liabilities can be created, further legislation must be had.

"It will be thus seen that there is no analogy between this case and the case of *Nougues* v. *Douglass et al.* (7 Cal. 65), cited by the plaintiff in error. The Act of 1856, considered in the latter case, authorized a contract for the construction of a capitol for a sum not exceeding $300,000, and provided that the payments should be made in bonds of the state, redeemable in thirty years; and at the time of its passage, the State was indebted to the amount limited by the Constitution without a vote of the people."

It is these three cases that were relied upon by the court in *People* v. *Pacheco, supra,* to support the proposition that no indebtedness was created by the act there in question. These cases do not purport to overrule the cases of *People* v. *Johnson, supra,* or *Nougues* v. *Douglass, supra,* but, on the contrary, distinguish such cases. It will be observed that all these cases dealt with statutes providing for annual payments to be met by annual tax levies. The decisions do not, therefore, apply to a single indebtedness, exceeding $300,000, evidenced by bonds of the state. Such an indebtedness, when created by the legislature without the vote of the people, was held to be invalid under the provisions of article VIII of the constitution of 1849 in the case of *Nougues* v. *Douglass, supra,* notwithstanding the act in question made provision for payment of the bonds as they accrued. So far as we know it has never been held by this court that a bond issue submitted to the people did not create an indebtedness.

The proposition advanced in *People* v. *Pacheco, supra,* has been generally accepted throughout the United States as far as it applies to the application of appropriations to current indebtedness created during the period intervening between two sessions of the legislature. (*Rowley* v. *Clarke,* 162 Iowa, 732, [144 N. W. 908] ; *State* v. *Medbery,* 7 Ohio St. 522; *State* v. *Parkinson,* 5 Nev. 15; *In re State Debts,* 19 R. I. 610 [37 Atl. 14] ; but see, also, *Fleckten* v. *Lamberton,* 69 Minn. 187 [72 N. W. 65].) But the decision has not been accepted as authority outside of California for the

proposition that bonds do not create an indebtedness where the law authorizing the bond issue provides ways and means. for the payment of the bonds (*State ex rel.* v. *Candland et al.,* 36 Utah, 406 [140 Am. St. Rep. 834, 24 L. R. A. (N. S.) 1260, 104 Pac. 285]; *Rowley* v. *Clarke, supra; State* v. *McMillan,* 12 N. D. 280 [96 N. W. 310]). As early as December, 1868, Judge Deady, of the United States circuit court, in deciding the case of *Coulson* v. *City of Portland,* Fed. Cas. No. 3275 (Deady's Reports, 481, 499), said:

"I have never been able to bring my mind to assent to the reasoning by which the Court [in *People* v. *Pacheco, supra*] arrived at the conclusion that the act in question did not create a debt. By means of such artificial reasoning and unlooked for construction of popular and plain terms and phrases, constitutions may be purged of every prohibition upon the legislative power of taxation and creating indebtedness, which the wisdom or fears of the people may place in them."

The distinction between the legislative power of taxation and the appropriation of money and the creation of debt during the period between the two sessions of the legislature and the creation of obligations extending beyond the two-year period is pointed out by the supreme court of Iowa in the case of *Rowley* v. *Clarke, supra.* That court, after calling attention to the fact that *State* v. *McCauley, supra, McCauley* v. *Brooks, supra,* and *Koppikus* v. *State Capitol Commrs., supra,* did not sustain the decision of this court in *People* v. *Pacheco, supra,* said:

"For the reasons already stated, we are not inclined to follow the California decisions. To do so would defeat the manifest design of the people in adopting the section of the Constitution in limiting indebtedness the General Assembly may create. The salutary purpose was to prevent mortgaging the revenues of the state in the future, beyond a specified amount, and, if this is to be rendered effective, it is quite as essential to denounce a scheme to incur a debt for the payment of which provision is made by a scheme of taxation as a debt to the payment of which no thought has been given. In either event, the funds to meet the obligation must be raised by taxation, and, in either, it is certain to be paid."

It is true that the mere fact that the decision in *People* v. *Pacheco, supra,* may seem to us to be incorrect and illogical so far as it applies to a period in excess of the two-year period between sessions of the legislature, would not alone justify us in departing from the rule therein laid down in the interpretation of the similar constitutional provisions in the constitution of 1879, adopted in the light of that decision, but the decisions in *People* v. *Johnson, supra,* and *Nougues* v. *Douglass, supra,* and the cases relied upon in *People* v. *Pacheco, supra,* are also a part of the constitutional history of the state, and in the light of these earlier cases we do not think it can be said that either under the constitution of 1849 or the constitution of 1879 a bonded indebtedness authorized by vote of the people would not create a debt or liability within the meaning of the constitution prohibiting an indebtedness of over $300,000, merely because the law authorizing the indebtedness and calling for a vote of the people, also provided, as the constitution required it must, ways and means for the payment of the bonds (art. XVI, sec. 1).

[1] It is clear, then, that the bond issue of $10,000,000 proposed to be submitted to the people will, if authorized by vote of the people, create an indebtedness against the state when such bonds are issued.

If the money derived from the sale of the bond issue is to be given or loaned directly to the veterans we would have exactly the question presented to the court of appeals of the state of New York in the case of *People* v. *Westchester County Nat. Bank, supra,* and which was by that court held to be a violation of the constitutional provision against the giving or loaning of the credit of the state. In one sense the loaning of money derived from the sale of bonds by the state is no more a loaning of the credit of the state than loans made by a bank of money deposited in such bank is a loan of the credit of the bank. But constitutional provisions of the character under consideration by which the people seek to limit the power of the legislature should not receive a technical construction but should be construed in the light of the evils to be remedied and the purpose to be achieved. There is no essential difference in the effect upon the state finances between selling a bond for $100 and giving the proceeds to an individual, and giving

the bond directly to the individual. The supreme court of the state of Minnesota in *William Deering & Co.* v. *Peterson,* 75 Minn. 118 [77 N. W. 568], a case involving loans to farmers for the purchase of seed wheat, said: "If the state cannot loan its credit, it cannot borrow the money on its own bonds, and then loan the money. It cannot do indirectly what it cannot do directly."

The same view was expressed by the supreme court of the state of North Carolina in the case of *Galloway* v. *Jenkins,* 63 N. C. 147. The legislature of North Carolina in 1868 had passed an act authorizing the treasurer of the state to deliver $2,000,000 in coupon bonds of the state to the Chatham Railroad Company in exchange for an equal amount of its stock. It was held that this was a giving or a lending of the credit of the state within the meaning of the constitutional prohibition, notwithstanding the fact that the state received stock of the railroad corporation of an equivalent amount in exchange for its bonds. In *Webb* v. *Lafayette County,* 67 Mo. 353, the supreme court of Missouri had under consideration the validity of a statute which authorized counties and townships to issue bonds in aid of railroads and which also provided that a portion of the state taxes derived from the counties and townships extending such aid should be applied by such counties and townships to the payment of such bonds without being remitted to the state treasury. This law was held unconstitutional as a giving or loaning of the credit of the state. In that connection the court stated as follows:

"To the extent that section 5 withdraws the state tax on such roads and applies it to the payment of a township subscription, every citizen of the state, in effect, and in fact, is required to pay a part of such subscription, when section 13 of the constitution declares, 'that the credit of the state shall not be given or loaned in aid of any person, association or corporation.' It is no answer to this to say that this is not giving or loaning the credit of the state. We agree that it is not done directly, but that it is done indirectly is clear; for what is the difference between giving this tax directly to the railroad corporation, and giving it to a township to pay a debt contracted to such a corporation? Can that be done indirectly which is forbidden to be done directly? If so, constitutional inhibitions accom-

plish nothing, and organic laws may be set at naught by the merest evasion. We admit the power of the General Assembly to control and dispose of the funds and revenues of the state, in its fullest and broadest sense, but when it is limited and restricted by the constitution, it is to be exercised only in conformity thereto, and not simply according to legislative will.''

[2] So far as our research reveals, the decisions are unanimous upon the proposition that this provision of the constitution prohibiting the giving or loaning of credit should be construed liberally to effect its purpose. Such construction would, therefore, prohibit any plan or scheme by which in substance and effect the credit of the state is given or loaned, regardless of the particular form which the transaction takes. In two recent decisions upholding the issuance of bonds to be devoted to the raising of money to pay veterans a bonus, provisions of the state constitutions involved prohibiting the giving or loaning of the credit of the state were not considered. This was pointed out in *People* v. *Westchester County Nat. Bank, supra:* ''In Minnesota the money necessary to pay a bonus was to be borrowed. It was held that the purpose of the loan was public and the act constitutional. A clause like ours was in the Constitution (Sec. 10, art. 9), but this phase of the matter seems not to have been argued. Certainly it was not referred to in the opinion. (*Gustafson* v. *Rhinow,* 144 Minn. 415 [175 N. W. 903].) Again in Washington a bonus was to be financed by an issue of bonds. Again, too, a similar clause in the Constitution (Sec. 5, art. 8) was not referred to. But in discussing whether the purpose of the act was public, the court did say that moral obligation to make a compensation rested on the state (*State ex rel. Hart* v. *Clausen,* 113 Wash. 570 [194 Pac. 793]).''

In *State* v. *Johnson,* 170 Wis. 218 [175 N. W. 589], one of the points raised was: ''The act violates the provisions of Sec. 3 of Art. 8 of the Constitution, which inhibits the giving or loaning of the credit of the state in aid of any individual.'' The question thus raised is not discussed in the opinion, for the reason evidently that the scheme there under consideration was one by which the state levied a tax for a number of years and authorized its expenditure and therefore did not create a debt because there was no

assumption of any obligation and the arrangement was to give money to the veterans when obtained from year to year by taxation.

[3]  The plan contemplated by the Veterans' Farm and Home Purchasing Act to which a portion of the money raised by the bond issue is to be devoted is substantially this: The veteran selects the farm or the home which he desires to purchase and calls the attention of the Veterans' Welfare Board to his desire to purchase this particular piece of property. If they approve of the application they purchase the land with the money of the state derived from this bond issue and sell to the veteran for the same price plus interest and a due proportion of the expense of the administration of the law, upon terms of payment by which the repayment to the state may be extended over forty years. There is no essential or substantial difference between this procedure and the procedure which would be involved in loaning the purchase price of the land directly to the veteran and taking a mortgage back upon the property he purchased with the money so loaned. It is impossible to escape the conclusion that this is in substance and effect a loaning of the credit of the state to the veteran purchasing the farm or home. No advantage is gained by the state by reason of these loans except the fundamental and underlying advantage which is supposed to accrue from all statutes making provisions for veterans; that is, a stimulation of patriotism on the part of others who may be called upon to engage in future wars and the promotion of the general welfare by giving due recognition and reward to those who in their service for their country have jeopardized their lives and accepted the hazards of war for the purpose of perpetuating the institution under which they live. While these considerations may well justify the classification of citizens so that such veterans receive special consideration in the making of such loans, it cannot deprive the transaction of its essential characteristics of a gift or loan of the credit of the state.

The Veterans' Bond Act of 1921 also provides for the use of the proceeds of the bonds by the Veterans' Board in connection with the purchase, improvement, subdivision, and sale of large tracts of land contemplated by and provided for in the Veterans' Welfare Act. It is pointed out that

another bond issue is pending for this same general purchase, but authorizing the purchase of the land so purchased, improved, and subdivided by settlers other than veterans. Two such settlements have already been provided for by direct appropriation of money for that purpose (Stats. 1917, p. 1566). In this scheme of subdivision in the Veterans' Welfare Act as well as in the provisions of the Veterans' Farm and Home Purchase Act for the direct purchase of individual farms or residences for the benefit of the veteran, the state pays the purchase price of the land and sells to the veteran on long terms of credit. There is, however, a very essential difference between the two schemes. In the one no benefit accrued to the state other than the indirect one involved in the reward of the veteran; in the other there is carried out a policy of land settlement. In the case of the land settlement provision an object is achieved other than the mere extending of credit to veterans. In the case of *Veterans' Welfare Board* v. *Riley,* 188 Cal. 607 [206 Pac. 631], we called attention to the fact that the decisions were not uniform with relation to the question as to whether or not a plan of purchase and subdivision of land was a public purpose for which public money might be appropriated and used, and in that case we placed our decision as to the constitutionality of the act upon the ground that the statute authorized expenditures in aid of veterans, which is conceded to be a public purpose, and gave aid in such a way as not to violate the constitutional provisions under consideration with regard to giving of the money and credit of the state. If the purpose achieved by the purchase and subdivision and settlement of the land is a public purpose and justifies the expenditure of public money, and if the scheme provided by the Veterans' Bond Act and the Veterans' Welfare Act for the purchase and subdivision of which such land accomplishes this public purpose, it may well be that we would not be justified in declaring such a law unconstitutional because of the fact that incidental to the main purpose there was an advantage to the purchaser of the land ultimately derived from the credit of the state. If we look at the form of the transaction it is not a giving or a loaning of the credit of the state; it is a purchase of land by the state, a sale of that land and an extension of credit for the purchase price. If

we look at the substance of the transaction as we have said with reference to the Farm and Home Purchasing Act, it is a loan unless there is some other factor also entering in the substance of the transaction which changes its character. [4] Where a separate and distinct public purpose is achieved and such public purpose is one within the constitutional powers of the legislature to bring about, we do not feel that we would be justified in declaring that the law is unconstitutional because of the fact that as an incident to its main purpose the credit of the state is used to effectuate that purpose. [5] As has frequently been said, doubts are to be resolved in favor of the constitutionality of a statute. And if the injection into this scheme of the separate and distinct public purpose involved in land settlements raises such a doubt, the law should be upheld as constitutional.

We therefore turn to the question of whether or not the purpose sought to be achieved by the law for the settlement of large tracts of land after their improvement by the state is a public purpose. The question is a federal as well as a state question, for the taking of money by taxation for private instead of public purposes is a violation of the federal as well as of the state constitution. For that reason the decision of the supreme court of the United States in *Green et al* v. *Frazier et al.*, 253 U. S. 233 [64 L. Ed. 878, 40 Sup. Ct. Rep. 499, see, also, Rose's U. S. Notes, Supp.], in passing upon certain statutes of North Dakota is of great, if not controlling, importance. Among other acts of the legislature of the state of North Dakota was one with reference to home building, as follows:

"The Home Building Act declares the purpose of the State to engage in the enterprise of providing homes for its residents and to that end to establish a business system operated by it under the name of 'The Home Building Association of North Dakota'; and defines its duties and the extent of its powers. [Laws 1919, c. 150.] The Industrial Commission is placed in control of 'The Home Building Association,' and is given the power of eminent domain, and the right to purchase and lease the requisite property. Provision is made for the formation of home building unions. The price of town homes is placed at $5,000, and of farm homes at $10,000. A bond issue of $2,000,000,

known as 'Bonds of North Dakota Home Building Series,' is provided for.''

In considering that matter the court upheld the state＊ statute and laid down the following general principles and disposed of the matter as follows:

''What is a public purpose has given rise to no little judicial consideration. Courts, as a rule, have attempted no judicial definition of a 'public' as distinguished from a 'private' purpose, but have left each case to be determined by its own peculiar circumstances. Gray, Limitations of Taxing Power, Sec. 176, 'Necessity alone is not the test by which the limits of State authority in this direction are to be defined, but a wise statesmanship must look beyond the expenditures which are absolutely needful to the continued existence of organized government, and embrace others which may tend to make that government subserve the general well-being of society, and advance the present and prospective happiness and prosperity to the people': Cooley, Justice, in *People* v. *Salem*, 20 Michigan, 452. Questions of policy are not submitted to judicial determination, and the courts have no general authority of supervision over the exercise of discretion which under our system is reposed in the people or other departments of government. *Chicago, B. & Q. R. R. Co.* v. *McGuire*, 219 U. S. 549 [55 L. Ed. 328, 31 Sup. Ct. Rep. 259]; *German Alliance Ins. Co.* v. *Lewis*, 233 U. S. 389 [58 L. Ed. 1011, 34 Sup. Ct. Rep. 612, see, also, Rose's U. S. Notes].

''With the wisdom of such legislation, and the soundness of the economic policy involved, we are not concerned. Whether it will result in ultimate good or harm it is not within our province to inquire.

''We come now to examine the grounds upon which the Supreme Court of North Dakota held this legislation not to amount to a taking of property without due process of law. . . .

''As to the Home Building Act, that was sustained because of the promotion of the general welfare in providing homes for the people, a large proportion of whom were tenants moving from place to place. It was believed and affirmed by the Supreme Court of North Dakota that the opportunity to secure and maintain homes would promote the general welfare, and that the provisions of the statutes

to enable this feature of the system to become effective
would redound to the general benefit. . . .

"This is not a case of undertaking to aid private insti-
tutions by public taxation as was the fact in *Citizens' Sav-
ings & Loan Assn.* v. *Topeka,* 20 Wall. 655, 665 [22 L. Ed.
544]. In many instances States and municipalities have in
late years seen fit to enter upon projects to promote the
public welfare which in the past have been considered en-
tirely within the domain of private enterprise."

It is true that in this decision the supreme court of the
United States announced its purpose to be controlled some-
what in its determination of the broad general question as
to whether a legislative scheme takes property without due
process of law, or for a private purpose, by the decisions
of the various state courts based upon the knowledge of
those courts of the local conditions and not to interfere with
such legislative schemes under the broad provisions of the
federal constitution where the legislature and the courts of
the state have virtually declared that the purpose is a
public one, unless it is very clear that the purpose is not
such. [6] It is obviously the view of the supreme court
of the United States, and in this view we concur, that the
broad general restrictions against the taking of property
without due process of law ought not to be construed so as
to prevent legislative action adjusted to the growing needs
and the changed condition of the people. The situation
existing where there are relatively small areas of public
lands available for settlement is vastly different from that
which confronted our ancestors when the great problem
before the public was the settlement of the vast areas of
fertile and vacant land which was offered to settlers at
nominal prices. It is well recognized in this state that
small tracts of five, ten, fifteen, and twenty acres are suffi-
cient for a single settler if accompanied by an adequate
water right and used for horticulture, and that large areas
of land without water are only available for perennial
crops, and for that reason yield support to comparatively
few people.

The supreme court of Washington in *State ex rel. Recla-
mation Board* v. *Clausen,* 110 Wash. 525, 530 [14 A. L. R.
1133, 188 Pac. 538], held a land settlement act constitu-

tional. The problem is disposed of in the opinion as follows:

"Our problem, then, is reduced to this, is the raising of funds by taxation and the expenditure thereof for the purchase of land to the end that it be subdivided, improved and disposed of as by the terms of this act provided, the exercise of the power of taxation and the expenditure of public funds for a public purpose? . . . Is there not abundant room for arguing that the development of our unoccupied lands suitable for agriculture, by a land policy which would encourage the settlement thereon of home owning farmers, will materially contribute to the welfare of our people as a whole? Can it not be argued with a fair show of reason that not only will such a policy ultimately lead to the enhancement of the material wealth of the state, but that it will also make for better citizenship, better notions of necessity for law and order, and a sounder and saner patriotism? In the light of the debatable character of these questions, we are quite convinced that it is not within the province of the judicial branch of our state government to answer them in the negative. Our decision sustaining the Workmen's Compensation Act of 1911, in *State ex rel. Davis-Smith Co.* v. *Clausen,* 65 Wash. 156 [37 L. R. A. (N. S.) 466, 117 Pac. 1101, 2 N. C. C. A. 823, 3 N. C. C. A. 599], seems quite in harmony with, and to lend support to, the conclusion we here reach. . . . "

The supreme court of Montana in the case of *Hill* v. *Rae,* 52 Mont. 378 [Ann. Cas. 1917E, 210, L. R. A. 1917A, 495, 158 Pac. 826], held that a statute providing for loans to farmers authorized the raising of money by taxation for public and not private purposes. After reciting the fact that one-third of the productive population of Montana were engaged in agriculture and the agitation in favor of loans to farmers and the public necessity and advantage thereof, the opinion proceeds as follows: "In the light of these circumstances it is impossible to avoid the conclusion that the subject appeared to be one 'held by the strong and preponderant opinion to be greatly and immediately necessary to the public welfare' (*Noble State Bank* v. *Haskell,* 219 U. S. 104 [55 L. Ed. 341, 31 Sup. Ct. Rep. 299, see, also, Rose's U. S. Notes]), and that, whether wisely or not, the legislature, in enacting the law in question, did

believe that it was legislating to develop the resources of the state and to add to its prosperity. It is not our province to assert that this was a mistaken belief.''

In *Wheelon* v. *South Dakota Land Settlement Board,* 43 S. D. 551 [14 A. L. R. 1145, 181 N. W. 359], a land settlement act was held to be for a public and not for a private purpose. The supreme court of Oregon in the case of *McMahan* v. *Olcott,* 65 Or. 537 [133 Pac. 826], held that a somewhat similar law was constitutional and that it did not authorize the expenditure of public revenue for a private purpose. That statute, however, differs from the one under consideration for the reason that a part of the land embraced in the district to be improved and sold already belonged to the state.

This court has taken a liberal view in determining what constitutes a public purpose. In *Daggett* v. *Colgan,* 92 Cal. 53 [27 Am. St. Rep. 95, 14 L. R. A. 474, 28 Pac. 51], an act appropriating money for the erection of buildings and maintenance of an exhibit at the World's Fair Columbian Exposition in 1893 was held constitutional. It was held in that case that the question of whether or not a statute affects a public purpose is held to be largely one for the determination of the legislature itself, a determination only to be interfered with in cases where it is clear that the legislative discretion has been abused. A similar appropriation was upheld by the supreme court of the state of Kentucky (*Norman* v. *Board of Managers, etc.,* 93 Ky. 537 [18 L. R. A. 556, 20 S. W. 901]). Our constitution was amended to allow public debts to be incurred in furtherance of the Panama-Pacific International Exposition to be held at San Francisco. Our laws for the irrigation, reclamation, and drainage of land by moneys raised by taxation, or local assessment, have been held constitutional upon the theory that the work so authorized to be done was in furtherance of the public interest and promoted the general welfare and was for that reason a public and constitutional purpose. If it is legitimate to tax or assess the land within a given area described as an irrigation district for the purpose of bringing water to and distributing it upon the lands within the district, as has been so frequently held in this state and affirmed by the supreme court of the United States, it must follow that a land settlement plan by which

an agency of the state is to secure land, conduct water to it and provide for its distribution thereon, is equally a public purpose, although for the purpose of carrying out the plan the legislature authorizes the acquisition of the title of the land and the subsequent sale of the land as so improved.

[7] We conclude, therefore, that the provisions of this statute authorizing a bond issue for the purpose of acquiring, subdividing, improving, acquiring water rights for, and selling the land so improved at cost are valid as authorizing the expenditure of public money for a public purpose.

In view of the fact that the money raised by the bond issue so far as it is to be applied to the purchase, subdivision, etc., of land under the Veterans' Welfare Act is applied to a public purpose, it follows that the fact that incidentally there is a benefit derived by the purchaser from the credit of the state and that such purchaser is a veteran should not render invalid such legislation. That is to say, where the transaction authorized by statute on its face purports to be a purchase and sale of land and there is no loan of credit in the ordinary acceptation of such terms and where in substance and effect the legislation accomplished a wholly different public purpose from the mere extension of credit, the law is not to be held unconstitutional as a violation of the substance and effect of the provision against lending or giving the credit of the state. [8] In this connection, however, it should be clearly stated that we are not to be understood as approving those portions of the law providing for the loaning of money from the proceeds of the bonds to settlers to enable them to purchase personal property to carry on their farming operations. This would be as clearly a loaning of the credit of the state as in the case of the farm and home purchasing provision by which land selected by the veteran is to be purchased by the Veterans' Welfare Board and turned over to him upon long term credit is a loaning of the credit of the state.

It is true that the giving or lending of money as a bonus to an ex-soldier is also recognized as a public purpose, and we have this fact to consider in the Farm and Home Purchasing Act. But the method of extending aid is one expressly forbidden by the constitution, if we have regard to the substance and effect of the constitutional restrictions.

The distinction between this situation and that involved in the purchase, improvement, subdivision, and sale of large tracts of land, already pointed out, is perhaps not very great, but enough, we think, to require us to give the benefit of the doubt, if any, of the constitutionality of this scheme, to the legislative determination of that matter.

[9] The next question that presents itself is whether the unconstitutionality of this Veterans' Bond Act of 1921, so far as it authorizes the use of money from the sale of these bonds in the farm and home purchasing scheme, affects the validity of the bond issue so far as it would authorize the Veterans' Welfare Board to use the money derived from the sale of bonds in the purchasing, improving, subdividing, and disposition of such land so subdivided. If the whole scheme were so intimately connected that the failure of one part of it would indicate that the legislature would not have passed the other without the unconstitutional provision, the whole law would have to be declared unconstitutional. In view of the fact, however, that there are 131,000 veterans in the state of California who would be entitled to the benefit of the act and that the act authorizes lands worth $5,000 to be conveyed to one veteran, it is clear that the amount provided by the law will not be sufficient to extend the benefit of the Veterans' Welfare Act to each veteran, and it is doubted by the members of the Veterans' Welfare Board who addressed the court in behalf of this law whether there be sufficient money to take care of the wants of the wounded and disabled veterans who were given precedence under the law. In view of this fact we cannot say that the legislature would not have passed the act if they had known that the portion of it authorizing the expenditure of money for the farm and home purchasing features of the plan would have been declared unconstitutional.

[10] Article XVI, section 1, provides that the legislature shall not create a debt ''unless the same shall be authorized by law for some single object or work to be distinctly specified therein.'' Article IV, section 34, also provides: ''No bill making an appropriation of money, except the general appropriation bill, shall contain more than one item of appropriation, and that for a single and certain purpose, to be therein expressed.'' It is claimed by the

respondent that the statute in question violates these provisions of the constitution. The argument advanced in support of this proposition is that the law authorizes the use of the money for two purposes, that is, one for the Veterans' Welfare Act and the other for the Farm and Home Purchasing Act. If this question were in doubt it is settled by the fact that our conclusion is that the law does not authorize the use of the money derived from the sale of the bonds for the Farm and Home Purchasing Act, because in so far as it does make such provision it is unconstitutional.

If it is to be assumed that article IV, section 34, applies to bond issues authorized by the voters of the state after submission to them under the provisions of article XVI, section 1, it must also follow that if the statute submitting the matter to the voters is for a single object, all the appropriations therein made are also for that object and therefore for a single object within the meaning of article IV, section 33. We have no doubt that the bond issue is for a single purpose within the meaning of article XVI, section 1, and that in this respect the law is constitutional.

[11] It is next contended that the law is unconstitutional for the reason that it does not provide ways and means for the repayment of the loan as required by article XVI, section 1. Section 5 of the act does provide in general terms that the bonds shall be paid from a fund to be raised in part by taxation in the same manner as moneys raised for the general purposes of the state. Under our present system of taxation the rate to be paid for state taxes is fixed by the constitution itself and it requires a law passed by two-thirds of the members of the legislature to increase this tax rate. The voting of these bonds in effect pledges the legislature as a part of the tax-raising machinery of the state to provide for such increase of taxes whenever the same is necessary in order to pay the interest and principal due on these bonds, regardless of whether or not the bond act was passed by a two-thirds vote. The provision is the one usually incorporated in the laws for the submission of bond issues to the people of the state. This matter is discussed at length in the case of *Morton, Bliss & Co.* v. *Comptroller-General*, 4 S. C. 430, and we content ourselves with the citation of this well-reasoned case as stating the

reasons for the validity of the act in question. That case also deals with the question as to whether or not more than one subject is covered by the law there in question and we refer to that decision upon that point also as confirming our view on that matter.

The objections to the validity of this statute are not well taken. We are not called upon to determine whether or not there are or may be other features of the law which are unconstitutional. If any of its provisions are valid it should be published and voted upon.

Peremptory writ of mandate will issue.

Lennon, J., Sloane, J., Shaw, C. J., Shurtleff, J., Lawlor, J., and Waste, J., concurred.

Rehearing denied.

All the Justices concurred, except Wilbur, J., and Lennon, J., who were absent.

Shurtleff, J., was also absent, and Richards, J., *pro tem.,* was acting.